802 F.2d 457
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PATRICIA A. GILL, Plaintiff-Appellant
v.
FEDERAL KEMPER LIFE ASSURANCE CO., Defendant-Appellee.
 No. 85-3670.
 United States Court of Appeals, Sixth Circuit.
 Aug. 1, 1986.
 
 BEFORE: WELLFORD and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 WELLFORD, Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 Edwards, Senior Circuit Judge.
 
 
 1
 Plaintiff Patricia A. Gill appeals from an order of the district court granting summary judgment in favor of the defendant Federal Kemper Life Assurance Company and dismissing the plaintiff's action as beneficiary for the proceeds of an insurance policy on the life of plaintiff's deceased husband, William P. Gill. The district court held that plaintiff's recovery was barred by Ohio Rev. Code Ann. Sec. 3911.06 (Page 1971) due to the fraudulent omission of certain material facts concerning the insured's health in the insured's application.
 
 I.
 
 2
 On January 29, 1983, the decedent William Gill consulted Dr. Thaddeus Stabholz for treatment of a constant cough that had developed during the winter. The decedent consulted Dr. Stabholz again on February 1, February 5, and February 12, 1983. When the decedent went to see Dr. Stabholz again on February 19, 1983, he indicated to Dr. Stabholz he that was coughing up blood. The decedent continued to see Dr. Stabholz, with visits on March 1 and March 4, 1983, and on March 7, 1983, Dr. Stabholz prescribed and scheduled a chest x-ray for the decedent on the following day.
 
 
 3
 On March 8, 1983, the decedent was given a chest x-ray by radiologist Dr. G. Zaldivar. Upon examination of the x-ray, Dr. Zaldivar informed Dr. Stabholz that "the x-ray showed changes consistent with bronchopulmonary malignancy involving the right upper lobe of the lung."
 
 
 4
 On March 11, 1983, Dr. Stabholz informed the decedent by telephone of Dr. Zaldivar's findings, telling him that his condition "may be serious." Dr. Stabholz also referred the decedent to a specialist for further treatment of the brochopulmonary malignancy and made an appointment for the decedent with the specialist on March 17, 1983.
 
 Plaintiff asserts in her affidavit that
 
 5
 [a]t no time, up to and including March 17, 1983, did any doctor or any other person inform my late husband and me of any impression of malignancy in the lung area or as to any other illness or decision which eventually caused his death; further, Dr. Stabholz, in the months of January, February and March, 1983, during the prescribing of cough expectorants and an antibiotic, examined my said husband and assured him that his lungs were "clear."
 
 
 6
 10. Affiant herein specifically states that neither Dr. G. Zaldivar, nor Dr. Thaddeus Stabholz, or any other medical practitioner, informed my late husband prior to and including the date of March 17, 1983, that my said late husband had any medical problem involving a malignancy of the lung or any other part of the body.
 
 
 7
 11. Affiant further states that my said late husband was informed, for the first time, that there existed a malignancy in his lung in the month of April, 1983, following a visit to Dr. A. Najib [the specialist to whom Dr. Stabholz referred decedent], who subsequently hospitalized him and operated upon his lung on April 15, 1983.
 
 
 8
 On March 17, 1983, an insurance agent for the defendant came to the decedent's business and discussed hospitalization and life insurance with the plaintiff and her husband, the decedent. Plaintiff asserts in her affidavit that the agent had been called by the decedent only to discuss a hospitalization plan. Plaintiff states in her affidavit that the agent
 
 
 9
 discussed the matters of a hospitalization policy with both of us, had my late husband sign an application form for hospitalization upon which the said Defendant's agent filled out appropriate answers to the requested information on said hospitalization application form and gave it to my late husband for signature.
 
 
 10
 After the decedent signed and paid for the hospitalization policy, plaintiff asserts in her affidavit that the agent then urged the decedent to take out a life insurance policy. She asserts that the decedent at first declined, but finally relented. The agent then allegedly presented the decedent a blank application and reguested that the decedent sign and date the document. The decedent wrote a check in the amount of the required premium and, according to plaintiff's affidavit, the "agent took the check and the signed form, and said he would fill out the necessary information, process it through the company's main office, and that we would receive our policy in a short time." Plaintiff further asserts:
 
 
 11
 At no time during the full and complete discussion on the subject of life insurance policy did said Defendant's agent ask my late husband any questions regarding the subject of the health history of my late husband, nor was my late husband requested to do anything other than to affix his signature, as aforesaid, to the said life insurance application form and to date it.
 
 
 12
 The agent's affidavit, on the other hand, merely notes that
 
 
 13
 [a]ll questions directed to the proposed insured which appear on the application were asked of and answered by Mr. Gill, and all such answers had been filled in on the application at the time of Mr. Gill's signing of the application.
 
 
 14
 4. When I asked Mr. Gill the questions regarding his past medical history, he informed me only that he had had a sprained or pulled back approximately one year before, and that he had seen a Dr. Turner for treatment of his back. Mr. Gill told me that he had no personal physician, and that he had no other health problems.
 
 
 15
 The agent denies any knowledge of the decedent's lung problem, of any omissions in decedent's answers to the application's questions concerning medical condition and history, or of his recent visits to physicians.
 
 
 16
 There is no dispute concerning the fact that decedent furnished health information for the hospitalization policy application immediately before discussing with the agent the life insurance policy and signing the life insurance application form. With respect to the former, the "agent filled out appropriate answers to the requested information," yet plaintiff maintains that the "subject of health history" was not inquired about with respect to the latter policy. The application form itself, of course, contained a number of questions about health history.
 
 
 17
 The application signed by the decedent contained the following questions and answers:
 
 
 18
 22. Has any person proposed for insurance had or been treated for abnormal blood pressure, chest pain, heart murmur, heart disease, cancer, diabetes, epilepsy, rheumatic fever, or any disorder or disease of the circulatory, respiratory, mental, nervous, genito-urinary, skeletal, or digestive systems?
 
 
 19
 [Answer: ] No.
 
 
 20
 23. Has any person proposed for insurance been under observation or had medical or surgical advice or treatment, or been hospital confined during the past five years?
 
 
 21
 [ANSWER: ] Yes [with explanation in Answer to Question 30].
 
 
 22
 ----
 
 
 23
 27. To the best of your knowledge and belief, are all persons proposed for insurance now in good health and free from physical impairment and deformity?
 
 
 24
 [ANSWER: ] Yes.
 
 
 25
 28. Has any person proposed for insurance any disease or disorder not mentioned in the answers to previous questions?
 
 
 26
 [ANSWER: ] No.
 
 
 27
 29. Name and address of personal (family) physician.
 
 
 28
 [ANSWER: ] None.
 
 
 29
 30. Details of items 22 through 28. Give complete details, including dates, number of attacks, duration, results, names and addresses of physicians and hospitals, etc.
 
 
 30
 [ANSWER: ] Name of Person and Question No.: 23.
 
 
 31
 PRO. INSD.
 
 
 32
 Details: Pulled muscle in back 1/82 2 weeks some pain but okay. Dr. Earl Turner, D.C., 3717 Cleve. N.W., Canton, OH 44709.
 
 
 33
 Defendant then issued a policy on decedent's life which was delivered by defendant's agent to the decedent.
 
 
 34
 Within five months, the decedent died of lung cancer at age 42. Although all of the premiums due on the policy through that date had been paid, the defendant declined to pay the proceeds and voided the policy based on decedent's misrepresentations about the state of his health.
 
 
 35
 Plaintiff commenced the instant action in an Ohio state court, and it was removed to federal district court on the basis of diversity jursidiction. At the close of discovery, the defendant filed a motion for summary judgment and certain supporting affidavits. The plaintiff opposed the motion by her own affidavit, recited above in part, raising the two primary contentions on which she now relies on appeal.
 
 
 36
 The district court entered its order granting defendant's motion for summary judgment, relying on the Ohio statute that bars recovery on an insurance policy where an applicant for insurance willfully and fraudulently misrepresents a material fact[1] and Jenkins v. Metropolitan Life Insurance Co., 171 Ohio St. 557, 173 N.E.2d 122 (1961). The district court found that the defendant had clearly proved by its "unrebutted affidavits" that, but for a false answer fraudulently given on an application for insurance, the decedent would not have been issued the policy. Thus, the district judge concluded by summary judgment the defendant had the right to void the policy.
 
 II.
 
 37
 Plaintiff raises on appeal the two arguments presented to and rejected by the district court. First, plaintiff argues that a genuine issue of material fact was raised by the asserted lack of knowledge by the insured of the specific nature of his illness. Second, plaintiff argues that a genuine issue of material fact was raised by the insured's signing of the application in blank.
 
 
 38
 In order to rely upon the insured's responses to the application's health questions as a bar to recovery under the relevant Ohio statute, the defendant had to prove the elements expressly set out in the statute. In this case, plaintiff does not dispute defendant's assertions, supported by affidavit, that the answers were material; that they induced the defendant to issue the policy; that but for the answers the policy would not have issued; and that the agent and the defendant had no knowledge of the falsity or fraud of the answer. Thus, the only contested issue below was whether defendant clearly proved that the answers were willfully false and fraudulently made.
 
 
 39
 The district court reviewed the facts before it and concluded prior to the date he took out the life insurance policy at issue here, the decedent knew that he had a potentially very serious respiratory problem, for which he was being referred to a specialist. While the plaintiff's affidavit at first glance appears to put this fact in issue, her affidavit is critically flawed.
 
 
 40
 At issue is the the decedent's knowledge of his condition. His widow's affidavit is clearly insufficient under Fed. R. Civ. P. 56(e) to controvert the facts set out by defendant's proof in that she makes a conclusory assertion that her husband was not informed of his condition or asked certain questions. Rule 56(e) requires that
 
 
 41
 [s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.
 
 
 42
 Fed. R. Civ. P. 56(e) (emphasis added). To contravene the defendant's proof that the decedent was informed about his serious condition, plaintiff's affidavit on proof must indicate on its face that the information it contains is given upon personal knowledge; this requirement cannot be inferred. Antonio v. Barnes, 464 F.2d 584 (4th Cir. 1972). Plaintiff has not asserted any personal knowledge about the content of the telephone call from Dr. Stabholz to her husband on March 11, 1983, in which Dr. Stabholz reported Dr. Zaldivar's findings of a potential malignancy. She does not say the basis of any personal knowledge that Dr. Stabholz did not tell decedent that his condition "may be serious." She does not deny that this doctor referred the decedent to a specialist (making an appointment for decedent with that specialist on March 17, 1983). Evidence submitted by defendant establishes sufficient knowledge on the part of the decedent, unless controverted, that surely he would have known that the answers supplied on the insurance form were materially false. Moreover, the plaintiff widow's affidavit merely denies, again in conclusory fashion, that her deceased husband had any knowledge of "malignancy"; she does not deny her husband's knowledge of an obviously serious lung problem or that he repeatedly visited the doctor about persistent and worsening lung complaints. Knowledge of either of these latter facts would clearly render the answers supplied on the insurance form materially false.
 
 
 43
 Plaintiff apparently also argues that an applicant must know the exact nature of a physical ailment from which he suffers or for which he has been treated before disclosure is required in response to health questions of the type here involved. Plaintiff cites no authority for this proposition and we find no compelling basis for this argument.
 
 
 44
 In Jenkins v. Metropolitan Life Ins. Co., 171 Ohio St. 557, 173 N.E.2d 122 (1961), the Ohio supreme Court faced a similar factual situation, in which an insured omitted, in response to a specific question, mention of 16 visits to three doctors in the five years prior to his application for insurance. The insured did, however, mention one visit to one of the three doctors one year prior to application. The court observed:
 
 
 45
 We recognize that one applying for a life insurance policy may, in answering questions, honestly forget about visits to a physician, especially after a substantial lapse of time. However, in the instant case, the insured's answer on September 20 was only 12 days after he had seen Dr. Millay on September 8. Furthermore, the insured had also seen that doctor on August 19 and August 11 and saw him later on October 7. That the insured had not forgotten about Dr. Millay is clear from his answer to question 2(a) about his last being sick in November 1951 and treated by Dr. Millay then for a "cold."
 
 
 46
 Without these regular visits to Dr. Millay about the time of the application and without the misleading answer to question 2(a) ["When were you last sick?"], it may be that reasonable minds could have found that the insured's answer to question 5(f) ["Have you consulted any physican . . . within the last five years . . . ?"] was not willfully false and fraudulently made, notwithstanding the three visits to Dr. Millay in January 1952, the four visits to Dr. Krech in February and March 1952, and the five visits to Dr. Klopfer in 1948 and 1949. However, how can reasonable minds infer that the insured forgot about his visits to Dr. Millay only 12, 32 and 40 days before the signing of the application when he mentioned seeing that same doctor for a "cold" ten months before? Also, if he had not forgotten about those visits, how can reasonable minds infer that the insured did not intend to deceive the defendant insurer by giving his false answer to question 5(f)? What honest purpose could he have had in giving that answer?
 
 
 47
 173 N.E.2d at 125-26. The court found this evidence sufficient to shift the burden of production to the plaintiff to establish that the later consultations with physicians which were not revealed in the application were "not for or not known by the insured to be for any serious ailment or condition." Id. at 126.
 
 
 48
 In the instant case, there can be little doubt that the insured's knowledge of his condition was sufficient to reguire him to address his health problem in the application. The insured saw Dr. Stabholz eight times within less than two months concerning the same respiratory problems (the symptoms of which included coughing up blood); that he went in on a separate occasion for a chest x-ray; that he spoke with Dr. Stabholz six days before taking out the policy and was referred to a specialist for treatment of a serious lung problem; and that he was scheduled to see this specialist the very day he took out the insurance. We find that summary judgment was appropriate on the issue of the decedent's knowledge of facts sufficient to make the health information supplied the insurer willfully false and fraudulent, if made or adopted by the decedent.
 
 III.
 
 49
 Plaintiff next argues that a genuine issue of material fact was raised by her assertion in her affidavit that her husband signed the application in blank.
 
 
 50
 The Supreme Court recently noted that "[a] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial" in the form of "significant probative evidence." Anderson v. Liberty Lobby, Inc., 54 U.S.L.W. 4755, 4759 (U.S. June 25, 1986).
 
 
 51
 The affidavits offered by the plaintiff widow and the insurance agent conflict as to whether the application for life insurance signed by the decedent was signed in blank.[2] This factual conflict is immaterial under the rule in Ohio that an insured is bound (under an agency theory of adoption) by answers supplied by an insurer's agent to an application signed in blank where a copy of the application is delivered to the insured. See Willig v. Prudential Ins. Co. of America, 71 Ohio App. 255, 49 N.E.2d 421 (1942).
 
 
 52
 This rule would be clearly applicable to this case if a copy of the application was returned to the insured with the policy, as alleged by the defendant. ("The policy of life insurance, including a copy of the application therefor, was delivered by agent Thomas Harrold to the decedent." Appellee's Brief, p. 6.) No proof, however, directly supports this assertion, and there is no evidence concerning the contents of the health insurance application contemporaneously signed by the decedent. Although the plaintiff's affidavit acknowledges receipt of the policy, no mention is made of the return or receipt of the application. The defendant's chief underwriter states in his affidavit merely that the policy was mailed for delivery to defendant's agent, and the agent's affidavit makes no mention of delivery of either application to decedent.
 
 
 53
 We find therefore that the district court erred in granting summary judgment on this issue under the factual record then before it.
 
 
 54
 The judgment of the district court is thus AFFIRMED in part and REVERSED in part, and we REMAND this case to the district court for further proceedings consistent with this opinion.
 
 
 55
 DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part. I concur in all of the court's opinion except Section III. I dissent from that section, and from the judgment of reversal, believing that the insurance company was entitled to summary judgment whether or not a copy of the completed application was incorporated in the copy of the policy delivered to the insured.
 
 
 56
 Although we must accept the plaintiff widow's testimony that the insured signed the life insurance application in blank, I do not read the Willig case as teaching that the insured can never be bound by someone else's answers on an insurance application unless the insured receives a copy of those answers. If it had been established that Mrs. Willig heard her husband give false answers to key questions on the application for her insurance policy, and failed to correct the answers even though she knew they were false, I see no reason to suppose that the Ohio Court of Appeals would have reached a different result in Willig if the copy of the policy subsequently received by Mrs. Willig had not incorporated a copy of the application.
 
 
 57
 In the case at bar, as the court's opinion makes clear, the insured must have known he was sick and that his sickness might prove serious. Nevertheless, as far as the plaintiff's affidavit discloses, the insured said nothing about his sickness when the insurance agent filled out the application for the hospitalization policy for which the insured had gone shopping, and he said nothing about his sickness when handed a life insurance application to sign in blank. Given the facts that are undisputed in this case, I think the insured should be deemed to have adopted the agent's answers to the questions on the life insurance application whether or not the insured ultimately received a copy of the completed application. When a dying man signs an insurance application in blank without disclosing a health problem that he has every reason to consider serious and of which the insurance company can have no knowledge if he fails to disclose it, I do not think he should be entitled to coverage merely because the insurance company has failed to confirm, other than by issuing the policy, that it did not know he was sick.
 
 
 58
 I would affirm the district court's judgment in its entirety.
 
 
 59
 Edwards, Senior Circuit Judge, concurring in part and dissenting in part. I concur in Section III of Judge Wellford's opinion in this case.
 
 
 60
 I cannot join Sections I and II since I believe the case presents other issues which require jury trial.
 
 
 
 [1]
 Ohio Rev. Code Ann. Sec. 3911.06 (Page 1971) provides:
 No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer.
 
 
 [2]
 The plaintiff states in her affidavit that no health questions were asked of decedent during the discussion of the life insurance policy (although she admits such questions were asked and answered minutes before for the purpose of completing the application for a hospitalization policy); that "my late husband [was not] requested to do anything other than to affix his signature, . . . to the form . . . and to date it;" and that the agent "said he would fill out the necessary information."
 The agent's affidavit states that "[a]ll questions directed to the proposed insured which appear on the application were asked of and answered by Mr. Gill, and all such answers had been filled in on the application at the time of Mr. Gill's signing of the application."