Kenneth STONE and Delores J. Stone, Plaintiffs and Counter–Defendants,

v.

Frank W. MEHLBERG and Mary E. Mehlberg, Defendants, Counter–Plaintiffs and Third–Party Plaintiffs,

v.

MICHIGAN ATTORNEY GENERAL'S OFFICE, Attorney General Frank Kelley, Michigan Corporation and Securities Bureau, Department of Licensing and Regulation, E.C. Mackey, Jaffe, Snider, Raitt & Heuer, Peter Sugar, Barton Greenberg, Gary L. Mitchell, Leslie A. Lupovich, and Patti L. Mitchell, Third–Party Defendants.

No. G88–833 CA7.

United States District Court, W.D. Michigan, S.D.

May 8, 1989.

Supplementary Opinion Jan. 3, 1990.

**1344**

Frank W. Mehlberg and Mary E. Mehlberg, Mancelona, Mich., in pro per.

Leslie A. Lupovich, Clinton, Conn., in pro per.

Frank J. Kelley, Atty. Gen. by John D. Walter, Asst. Atty. Gen., Lansing, Mich., for E.C. Mackey.

Collins, Einhorn & Farrell by Morton H. Collins, Gerald A. Pawlak, Southfield, Mich., for Peter Sugar.

Patti L. Mitchell and Gary L. Mitchell, Stanwood, Mich., in pro per.

## OPINION

HILLMAN, Chief Judge.

This is a case arising from the so-called Diamond Mortgage Corp. (Diamond)/A.J. Obie & Associates (Obie) mortgage-backed securities fraud. The main action and counterclaim pit Diamond victims Delores and Kenneth Stone against Obie victims Mary and Frank Mehlberg, in a dispute over the validity of a promissory note and undisbursed mortgage on the Stones' home, solicited by Diamond and assigned to the Mehlbergs as part of their Obie investment. The third-party action is a suit by the Mehlbergs against various state agencies and officials, and Diamond/Obie principals and alleged associates, whom the Mehlbergs hold responsible for the loss of their Obie investment.

The matter is before the court on six motions. Five of these are brought by third-party defendants, and one by plaintiffs in the main action, the Stones. The court will address each motion separately. The court will also take up several matters made material by the status conference held in this case on March 17, 1989.

## I. Background

Before analyzing the applicable facts and law, some background about Diamond and Obie is in order. The parties agree to at least the general outlines of the Diamond/Obie story as it emerges from the record of this case and numerous cases litigated in Michigan's state and federal courts. This court is familiar with some of the story from several related Diamond/Obie cases now pending here.

Diamond set up shop as a mortgage broker in 1973. Diamond's owners gained control of Obie, a securities dealer, in about 1980. Diamond and Obie ownership and management were so intertwined that the two entities were for all practical purposes indistinguishable. Diamond and Obie were also connected with Commerce Mortgage Investments and State Mortgage, two entities who played some role in other cases, but are not relevant to the issues here.

The precise methods of Diamond/Obie's business practices are still hazy, but this much is reasonably clear. Diamond would solicit a homeowner to purchase a loan secured by a mortgage on his or her principal residence. Despite the fact that Diamond represented itself as a broker, and charged the mortgagor an excessively high brokerage fee for arranging the loan, the loan transaction documents would often name Diamond as the lender, in apparent violation of Michigan law. However, Diamond typically was not the lender.

Instead, Diamond's mortgage loans were often funded by an investor purchasing "mortgage-backed securities" from Obie. As explained in Diamond/Obie's offering circular sent to all potential investors, in exchange for his or her Obie investment an investor would be assigned one or more of Diamond's mortgages and promissory notes, thus becoming primary mortgagee

on particular encumbered residences. After assignment, Diamond would act for a fee as the investor's servicing agent on the note and mortgage. Diamond/Obie's "mortgage-backed notes" were marketed through various media as safe, long-term investments. Many investors with Diamond/Obie were elderly or unsophisticated persons seeking extended, fixed rates of return that would secure their savings in a time of significant inflation and economic uncertainty.

It is now fairly well established that Diamond/Obie's actions were less than punctilious. Occasionally, the mortgage-backed note scheme would operate as described in the Diamond/Obie offering circular. Even when this occurred, it appears that either Diamond or Obie ignored numerous technical requirements imposed by state and federal law. On many occasions, however, Diamond or Obie engaged in outright fraud. For example, in some instances, Diamond solicited a loan and took a note, mortgage, and possibly brokerage fees from a homeowner, but never provided the homeowner with the agreed-upon loan funds. Diamond was able to obtain the loan documents without disbursing funds because federal law requires a three-day "cooling off" period between the consummation of a consumer credit transaction and disbursement.

Similarly, on the investment side, Obie often took an investor's funds and Diamond then failed to assign the investor a note and mortgage to back the investment. In other cases, Diamond did assign a note and mortgage, but the investor failed to realize any return because, as explained above, the mortgagor had not received his or her loan, and thus refused to make payments. At still other times, Diamond assigned paying notes and mortgages to more than one investor.

Diamond apparently embarked on its fraudulent course sometime in the middle or late 1970s. Consumer complaints about Diamond and Obie brought the entities under state governmental scrutiny in 1979. After beginning administrative proceedings against Diamond and Obie, the Michigan Corporations and Securities Bureau agreed to a 1981 consent order in which Diamond/Obie undertook to bring its operations into compliance with state securities law. In 1983, the Michigan Attorney General agreed to a similar consent judgment in Ingham County Circuit Court covering Diamond's mortgage lending practices. In the 1983 consent judgment Diamond specifically promised to meet the loan transaction disclosure requirements of state and federal law. Despite these legal undertakings, Diamond/Obie continued to ply its fraudulent trade. Although state authorities continued to receive complaints after the 1981 and 1983 consent orders, Diamond/Obie remained in business.

Diamond/Obie finally collapsed in bankruptcy in 1986. In 1987, several Diamond/Obie principals were convicted in state court of criminal fraud. The legacy of the fraud is catastrophic. Hundreds of homeowners who gave mortgages to Diamond but never received any loan had those mortgages recorded for the benefit of Obie investor assignees. Some of those mortgagors aware of the assignments were forced to sue the assignee to remove the encumbrance on their homes. Of course, those unaware of such assignments may still hold their homes under clouded title or even threat of foreclosure.

On the other side of the coin, thousands of Obie mortgage-backed notes are now worthless, or in view of the bankruptcy, at least greatly reduced in value. Press reports have stated that two thousand investors lost more than $40 million. Now pending in this court are several related civil actions brought by upwards of one thousand investors. These investors seek recovery against Diamond/Obie principals and alleged associates on a wide range of legal theories. The third-party action here is one such suit.

II. Main Action and Counterclaim

In the main action, the Stones seek rescission and damages from the Mehlbergs as Diamond's assignees in a fraudulent mortgage transaction. The Mehlbergs refuse to discharge a note and mortgage encumbering the Stones' home. The

Stones gave the note and mortgage to Diamond in exchange for an undisbursed loan. Diamond assigned the note and mortgage to the Mehlbergs in exchange for the Mehlberg's purchase of a "mortgage-backed note" from Obie. The Stones rely upon the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, as amended, and the Federal Reserve Board's Regulation Z, 12 C.F.R. § 226.1 *et seq.*, promulgated thereunder. The Stones also bring pendent state-law claims.

The Mehlbergs counterclaim for performance on the note, relying on Article III of the Michigan Uniform Commercial Code (U.C.C.), M.C.L.A. § 440.3101 *et seq.*, as amended. The Mehlbergs also rely on the U.C.C., along with the United States Constitution, as affirmative defenses to the Stones' claims.

The main action is before the court on the Stones' motion for summary judgment. Ordinarily, a summary judgment motion would not be proper at this early stage. However, the Stones' counsel has obviously completed discovery. The Mehlbergs are proceeding *pro se.* At the March 17, 1989 status conference, Frank Mehlberg informed the court that he does not plan to pursue pretrial discovery. Accordingly, lack of discovery is not an issue and the court may decide the Stones' motion.

The court has carefully considered all the evidentiary material in the file, including the documents attached to the Stones' motion and to several of the Mehlbergs' pleadings. The court may grant summary judgment only if the pleadings and affidavits show that there is no genuine issue as to any material fact, and that the Stones are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## A. *Facts*

The material facts are not in dispute. In the early 1980s the Mehlbergs became dissatisfied with the prevailing ten percent interest rates on bank certificates of deposit. Through advertising they heard of Obie. After talking with an Obie salesperson named Terry Knott, and reviewing the Diamond/Obie offering circular, they decided to invest. The Mehlbergs purchased mortgage-backed notes on four occasions in December 1984 and January 1985. Their total investment was $66,500. Throughout this investing period bank interest rates continued to drop. The Mehlbergs' mortgage-backed notes remained at a fixed fourteen percent.

On July 3, 1985 Obie informed the Mehlbergs that one of their assigned mortgages was in default. Obie asked the Mehlbergs to assign the delinquent mortgage back to Diamond. Obie promised that if the default could not be cured, the Mehlbergs would be assigned a replacement mortgage. The Mehlbergs assigned back the delinquent mortgage in July or August 1985. The reassignment form, as the Mehlbergs were aware, falsely stated that they had received the mortgage proceeds from Diamond.

Neither Diamond nor Obie notified the Mehlbergs of any cure in the default on their delinquent mortgage. Obie finally notified the Mehlbergs of a replacement mortgage, assigned by Diamond to them on March 25, 1986, by letter dated April 24, 1986. The delay between the notice of default on the delinquent mortgage and the arrival of the replacement mortgage was thus eight or nine months. Despite the fact that the Mehlbergs were unsecured in the amount of the delinquent mortgage during this time, and that they were receiving payments late on some of their other mortgages, they invested another $10,500 with Obie in March 1986.

The replacement mortgage, with accompanying promissory note, was given to Diamond by the Stones during a transaction that occurred on March 14, 1986. The mortgage collateral was the Stones' principal residence, in which both Delores and Kenneth Stone had an ownership interest at the time of the transaction. In exchange for the note and mortgage, Diamond promised to lend the Stones $23,000, less brokerage fee, for the Stone's personal or household use.

In addition to the note and mortgage, the loan transaction documents included a "closing package" containing a TILA dis-

closure statement and a document entitled "IMPORTANT CUSTOMER MUST READ." Diamond did not disburse the loan funds at the March 14 transaction, in accordance with TILA's three-day "cooling off" period. After the three days passed, however, Diamond still did not produce the agreed-upon loan amount, and the Stones in fact have never received any money for their note and mortgage.

As stated above, Diamond assigned the Stones' note and undisbursed mortgage to the Mehlbergs on March 25, 1986. The assignment was duly recorded with the county deed registry. Along with its April 24, 1986 letter, Obie sent the Mehlbergs copies or originals of the Stones' promissory note, recorded mortgage, loan application, credit information, insurance statement, and amortization schedule, and the mortgage and note assignment from Diamond.

None of the documents given to the Stones at the March 14, 1986 loan transaction contained any disclosure of their right to rescind the transaction within TILA's three-day "cooling off" period. None of the documents sent to the Mehlbergs along with Obie's April 24, 1986 letter disclose the Stones' TILA rescission right. The Stones' uncontroverted affidavit shows that neither Kenneth nor Delores Stone received two copies of any notice of the right to rescind the loan transaction.

The Stones waited for Diamond to produce their loan for some time. When the money was not forthcoming, they sought legal counsel. The Stones' attorney wrote Diamond and cancelled the note and mortgage on June 25, 1986. Diamond acknowledged the cancellation on July 1, 1986, and promised to discharge the mortgage. However, the mortgage had already been assigned to the Mehlbergs. The Stones discovered the assignment some months later. Accordingly, the Stones' attorney wrote the Mehlbergs on November 11, 1986, notifying them of the Stones' election to rescind the March 14, 1986 loan transaction under TILA. Despite this notice, the Mehlbergs refused to cancel the Stones' promissory note and discharge the mort-

gage they hold on the Stones' home by virtue of the assignment from Diamond. The Stones therefore filed the present suit.

*B. Rescission.* Analysis of the Stones' rescission claim is straightforward. TILA provides in pertinent part that

... in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following ... the delivery of the ... rescission forms required under this section ... by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

■ There is no question that the March 14, 1986 loan transaction between Diamond and the Stones was subject to the foregoing TILA provision. There is also no question that Diamond violated TILA by failing to provide both Kenneth and Delores Stone with two copies of the "right to rescind" forms required by the Board's Regulation Z. *See* 12 C.F.R. § 226.23(b). The Stones had the right to rescind the loan transaction within three days of delivery of the "right to rescind" forms. Because the forms were never delivered, the Stones' right to rescind was continuing, subject to the statute of limitations. *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 247 (6th Cir.1980).

■ The Stones properly exercised their right by informing the Mehlbergs of their intent to rescind by letter on November 11, 1986. *See* 12 C.F.R. § 226.23(a)(2). After rescinding the loan transaction, the

Stones were not obligated to pay the note, and the Mehlbergs were required to discharge the mortgage. 15 U.S.C. § 1635(b). The fact that the Mehlbergs were Diamond's assignees is immaterial. Rescission rights are equally enforceable against original creditors and assignees. 15 U.S.C. § 1641(c).

The Stones accordingly prevail on their TILA rescission claim, unless the Mehlbergs can assert an effective defense. The Mehlbergs first assert that they are protected by the U.C.C.'s holder in due course doctrine (HDC). This defense is irrelevant to the Mehlbergs' obligation to discharge the security interest they hold in the Stones' home. The mortgage at issue is not payable to order or bearer, and is thus not a negotiable instrument. *See* M.C.L.A. § 440.3104(1)(d).

As to the negotiable promissory note given by the Stones to Diamond on March 14, 1986 and subsequently assigned to the Mehlbergs, the court holds that TILA's rescission remedy preempts the HDC doctrine. 15 U.S.C. § 1635(a) states that obligors not informed of their rights are entitled to rescind "the transaction." The statute does not say that obligors may rescind only that part of the transaction that creates a security interest, but not the underlying obligation evidenced by a negotiable note. In fact, 15 U.S.C. § 1635(b) clearly contemplates a return to the status quo ante and thus the extinguishment of the underlying obligation. The HDC doctrine is inconsistent with this remedial purpose. Cases holding that a TILA breach does not discharge liability on a note, such as *Federal Deposit Ins. Co. v. Webb*, 464 F.Supp. 520, 525 (E.D.Tenn.1978) do not discuss rescission, which is specifically excepted from the general rule that TILA does not affect such obligations. *See* 15 U.S.C. § 1610(d).

Moreover, to allow assignee HDC's to assert their status to foil an otherwise meritorious rescission action would gut 15 U.S.C. § 1641(c). Congress added this provision to TILA in 1980 to "eliminate ambiguity on the question of assignee liability for rescission by stating explicity [sic] that

a consumer's exercise of this right is effective against an assignee." S.Rep. No. 96–368, 96th Cong., 2d Sess. 32–33, *reprinted in* 1980 U.S.Code Cong. & Ad. News 236, 268.

Congress could have said that rescission rights are effective against assignees who are not HDC's if it had chosen to do so. Instead, 15 U.S.C. § 1641(c) applies to *any* assignee. To read the statute not to apply to *any* assignee reinserts the ambiguity Congress attempted to eliminate. Finally, Congress was undoubtedly aware that many consumer credit notes memorializing mortgage transactions in this country are held by persons who could plausibly claim HDC status. To allow an HDC defense to stand against a rescission claim under these circumstances would therefore sanction a situation in which, in the words of the Senate Report on the bill that eventually became 15 U.S.C. § 1641(c), "the right of rescission would provide little or no effective remedy." 1980 U.S.Code Cong. & Ad. News at 268.

In sum, the HDC doctrine is not a defense against TILA rescission. Consequently, the Mehlbergs' assertion of HDC status does not prevent the Stones from cancelling the promissory note at issue.

Even if HDC status were a defense to the Stones' claim for rescission of the note and mortgage, the Mehlbergs do not enjoy such status. An HDC must take the negotiable instrument in good faith. M.C.L.A. § 440.3302(1)(b). In Michigan, "a finding of good faith is precluded by a party's failure to make appropriate inquiries where something appears on the face of the instrument or a fact is communicated such that the party could not honestly purchase without inquiry." *Paul v. U.S. Mutual Financial Corp.*, 150 Mich. App. 773, 389 N.W.2d 487, 494 (1986). In the present case the Mehlbergs could not honestly have accepted Diamond's assignment of the Stones' note without at least some inquiry.

The documents received by the Mehlbergs regarding the Stones' mortgage transaction, including the note itself, do not

contain any TILA disclosure of the Stones' rescission rights. The Mehlbergs had notice, through the Diamond/Obie prospectus, that the 1983 state consent order required similar disclosures. The Mehlbergs also had notice of Diamond's propensity to lie in mortgage assignment forms, through their reassignment of the delinquent mortgage that the Stones' note and mortgage eventually replaced. They also knew or should have known from the late payments received on other notes that problems might exist in the underlying loan transactions.

Similarly, from Diamond's failure to replace the delinquent note and mortgage for eight or nine months, leaving their investment partially unsecured in the meantime, the Mehlbergs knew or should have known that Diamond's adherence to its obligations was sloppy at best, and that the "sloppiness" might extend to mortgagors as well as investors. Finally, the fact that Diamond's mortgage-backed notes remained fixed at significantly above-market rates at a time when rates in general were falling should have alerted the Mehlbergs to possible irregularities in Diamond's mortgage operations.

Considering all these circumstances, a duty to inquire at least minimally about possible defenses the Stones might have on their note arose under Michigan law. The Mehlbergs thus are not holders in due course, and are subject to a TILA rescission defense. *See* M.C.L.A. § 404.3306.

▇▇▇ Turning from the U.C.C., the Mehlbergs apparently assert that the Stones have no TILA claim because TILA violates the United States Constitution. This defense need not detain the court for long. TILA does not abridge freedom of speech or contract. *United States v. Calegro de Lutro*, 309 F.Supp. 462, 466 (S.D. N.Y.1970) (construing 18 U.S.C. § 894, federal criminal "loan sharking" analogue to TILA; "[f]reedom of contract and of speech do not constitute a license to threaten, commit fraud, or practice usury.") TILA does not violate the Fourth Amendment, as there is no objectively reasonable expectation of privacy from governmental

regulation of the debtor/creditor relationship.

As for the Mehlbergs' due process and equal protection arguments, TILA passed Congress after extraordinary debate and deliberation. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 363–68, 93 S.Ct. 1652, 1657–60, 36 L.Ed.2d 318 (1973). The measure received the assent of President Johnson, and through the amendment process, virtually every President who followed him. As a general matter, Congress and the President are presumed to act constitutionally.

More specifically, the Supreme Court has said the following:

> The Truth in Lending Act reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.' By erecting a barrier in the form of hard facts, Congress expressly sought 'to ... avoid the uninformed use of credit.' 15 U.S.C. § 1601....
>
> That the approach taken may reflect what respondent views as an undue paternalistic concern for the consumer is beside the point. The statutory scheme is within the power granted to Congress under the Commerce Clause. It is not a function of the courts to speculate as to whether the statute is unwise or whether the evils sought to be remedied could better have been regulated in some other manner.

*Mourning*, 411 U.S. at 377–78, 93 S.Ct. at 1664–65. TILA does not offend the Constitution.

▇▇ C. *Damages.* The Stones' motion addresses only their claim for TILA rescission under 15 U.S.C. § 1635, not their damages claim under 15 U.S.C. § 1640. This leads the court to conclude that rescission is the Stones' preferred remedy. Rescission is an equitable remedy subject to imposition by the court of conditions designed to achieve a fair result. *See Rudisell*, 622 F.2d at 253–54.

▇▇ The court does not hold that TILA invariably requires an election of remedies. Nevertheless, in the unusual circumstances

of this case, the Stones' preference for rescission precludes their damages action. Rescission of the note and mortgage puts the Stones back in the position they occupied before they heard of Diamond. Damages for the Stones would thus be little more than icing on the cake. The Mehlbergs are victims of Diamond/Obie just as the Stones are, and they have suffered a grievous loss. To assess damages against them for what the court is satisfied to be a sincere, if erroneous, assertion of their right to the Stones' note and mortgage would add insult to injury. The equities point to waiver of their damages claim, along with their request for costs and attorney's fees, as the condition the Stones must accede to for the court to grant rescission.

D. *Pendent Claims.* The court's rulings on the Stones' TILA claims moot their state-law claims.

E. *Summary.* In light of the foregoing, in the main action the court will enter judgment for the Mehlbergs on the Stones' TILA damages claim. Judgment will likewise issue for the Stones on their TILA rescission claim, and the judgment will cancel the promissory note and discharge the mortgage. It follows that the court will grant judgment for the Stones on the Mehlbergs' counterclaim. Both the Stones and the Mehlbergs will bear their own costs.

### III. Third–Party Action

The Mehlbergs' third-party complaint is actually a series of documents, each aimed at a different defendant or defendants. The complaint names as third-party defendants the Michigan Attorney General's Office, the Michigan Corporations and Securities Bureau (MCSB), and the Michigan Department of Licensing and Regulation (MDLR) (collectively, the state defendants). The complaint also names E.C. Mackey, the MCSB's former director. The complaint additionally names one of Diamond/Obie's lawyers, Peter Sugar, and Diamond/Obie principals Barton Greenburg, Gary Mitchell, Patti Mitchell, and Leslie Lupovich (collectively, the principal defendants). Finally, the complaint names Michigan Attorney

General Frank Kelley and Sugar's law firm, Jaffe, Snider, Raitt & Heuer, P.C. These latter two defendants have not been served with the summons and complaint, and are therefore not parties to this action.

The third-party action is before the court on motions to dismiss under Fed.R.Civ.P. 12(b)(6) brought by Mackey and the MCSB, the MDLR, Patti Mitchell, and Gary Mitchell. Sugar has also filed a motion for summary judgment under Rule 56. Because the Michigan Attorney General's Office is in a position similar to the MCSB and the MDLR, the court will combine all the state defendants for purposes of this opinion despite the fact that the Attorney General's Office is not explicitly included in the MCSB's and MDLR's motions. For the same reason, the court will treat the principal defendants together. Mackey's and Sugar's motions will be addressed separately.

The court has read the Mehlbergs' third-party complaint with the liberality due *pro se* submissions. *See, e.g., Kent v. Johnson,* 821 F.2d 1220, 1223–24 (6th Cir.1987). The complaint seeks indemnity from the third-party defendants for any liability the Mehlbergs may incur to the Stones. Because the court has determined that the Mehlbergs must grant the Stones rescission of their promissory note, presumably the Mehlbergs wish to recover the value of the note from the third-party defendants. They cannot do so on the present complaint.

A. *State Defendants.* The state defendants are immune from suit in federal court under the Eleventh Amendment to the United States Constitution. *Abick v. State of Michigan,* 803 F.2d 874, 876–77 (6th Cir.1986). They will be dismissed from this action with prejudice.

B. *Principal Defendants.* The Mehlbergs' complaint against the principal defendants alleges only that Barton Greenburg was the principal officer of Diamond Mortgage Corp. and its affiliates, that Patti Mitchell was Greenburg's executive secretary, that Gary Mitchell was another principal officer of Diamond, and that Leslie Lupovich was Diamond's secretary/trea-

surer. Taking these allegations on their own, there is certainly nothing objectionable about being an officer or employee of a corporation. However, the court will read these allegations with the totality of the Mehlbergs' submissions in mind, and hazard a guess that, given the general background of Diamond/Obie, the Mehlbergs mean to sue the principal defendants on some sort of fraud theory.

Even with this expansive reading, the Mehlbergs' pleadings fail to state a claim. Under Fed.R.Civ.P. 9(b), the circumstances constituting fraud must be plead with particularity. In a complex securities fraud case such as this, the particularity need not be great. The fraud claimant need only place the defendant on notice of the general nature of the claim so he or she can reasonably frame a responsive pleading. Nevertheless, at a minimum the fraud claimant should allege "the parties and participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988).

■ Here, the Mehlbergs do not allege, among other things, that Barton Greenburg, Patti Mitchell, Gary Mitchell, or Leslie Lupovich made any representations whatsoever. They do not allege scienter or other improper intent. There is no way the principal defendants can respond to such a fraud claim, assuming the Mehlbergs do claim fraud. The Mehlbergs' claim against the principal defendants must be dismissed.

C. *Mackey.* In their complaint against E.C. Mackey, the Mehlbergs allege that during his tenure as the MCSB's director investigators uncovered many securities law violations by Diamond and its affiliates, but Mackey failed to act on the information at his disposal, allowing Diamond/Obie to defraud investors and mortgagors. The Mehlbergs apparently assert that Mackey's inaction amounted to fraud and violated the Fourteenth Amendment's Due Process Clause. The court assumes that the Mehlbergs intend to sue Mackey in his individual, not his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 168–70, 105 S.Ct. 3099, 3106–08, 87 L.Ed.2d 114 (1985).

■ The Mehlbergs' fraud allegations fail for the reasons stated above in connection with the principal defendants. As for the constitutional claim, absent a situation in which a public official restrains an individual's liberty to the extent that she is unable to protect herself, the official's failure to protect the individual from private criminal or tortious conduct does not violate due process. *DeShaney v. Winnebago Co. Dept. of Social Services*, — U.S. ——, 109 S.Ct. 998, 1002–07, 103 L.Ed.2d 249 (1989); *Tucker v. Callahan*, 867 F.2d 909, 915–16 (6th Cir.1989). There is no allegation here that Mackey affirmatively restrained the Mehlbergs' liberty to such a degree that it became impossible for them to protect themselves from Diamond/Obie. The complaint against Mackey will be dismissed.

D. *Sugar.* The court will not address Sugar's summary judgment motion at this time, because it intends to give the Mehlbergs an opportunity to amend their third-party complaint. However, the court will dismiss Sugar because the Mehlbergs have not stated a claim against him under Rule 12(b)(6).

The Mehlbergs assert that due to Sugar's lengthy representation of Diamond before the MCSB and "the seriousness of the matter involved," Sugar cannot "[plead] lack of knowledge." The complaint likewise alleges that Sugar was "involved in" Diamond's false advertising, and did not use "due diligence" in representing Diamond.

■ In light of the Mehlbergs' *pro se* status, the court reads these allegations as attempting to set forth causes of action for fraud and negligence. The fraud claim does not survive Rule 9(b) for the reasons given above. The negligence claim fails as a matter of law because Michigan attorneys owe a duty of due care only to their

clients, and Sugar thus owed no duty to the Mehlbergs. *See Friedman v. Dozorc*, 412 Mich. 1, 312 N.W.2d 585, 590–93 (1981) (Levin, J., for unanimous court on issue of attorney's duty); *American Employers' Ins. Co. v. Medical Protective Co.*, 165 Mich.App. 657, 419 N.W.2d 447, 448–49 (1988).

E. *Summary.* In light of the foregoing, the court will dismiss Sugar's summary judgment motion without prejudice. The court will grant the remaining pending motions, and dismiss the state defendants with prejudice, and the other defendants without prejudice. The court will allow the Mehlbergs an opportunity to amend their third-party complaint. The amended complaint must conform to the legal standards set forth in this opinion, and it must be filed on or before June 12, 1989. Failure by the Mehlbergs to timely amend will result in entry of final judgment for all defendants in the third-party action.

## IV. Additional Matters

The court and the parties agreed at the March 17, 1989 status conference that after disposition of the pending motions, amendment of the pleadings would follow. Amendment in the main action here is moot. As previously stated, the court will allow the Mehlbergs to amend their third-party complaint.

If the Mehlbergs choose to amend, the court suggests that they retain competent counsel. By now, the Mehlbergs are probably aware of the difficulty of prosecuting a complex legal matter like this on their own. It may be worthwhile for them to investigate the possibility of joining either of the similar suits now before the court, *Schriemer v. Greenburg*, case number G87–56 CA 1, filed by attorney Reginald Norris, or *Mercer v. Jaffe, Snider*, case number G88–380 CA 1, filed by attorney Thomas Koernke. The court will schedule a consolidation and discovery conference in all the pending Diamond/Obie cases following amendment of the pleadings. Copies of this opinion, judgment, and order will be forwarded to all counsel of record in the Diamond/Obie cases.

## SUPPLEMENTARY OPINION

The court rendered an opinion and partial judgment in this case on May 8, 1989. At that time, the court in the main action granted summary judgment to plaintiffs and counter-defendants Delores and Kenneth Stone on their Truth in Lending Act (TILA) rescission claim against defendants, counter-plaintiffs, and third-party plaintiffs Mary and Frank Mehlberg. The court also granted summary judgment to the Stones on the Mehlbergs' counterclaim for performance on a promissory note. The Mehlbergs' third-party complaint was dismissed, with leave to amend, for failure to state a claim upon which relief could be granted.

Following the May 8 order dismissing the third-party complaint, the Mehlbergs filed an amended third-party complaint. On July 7, 1989, the court entered a notice of intended sua sponte dismissal of the amended third-party complaint, because the amended document still failed to state a cognizable claim. In accordance with *Harris v. Johnson*, 784 F.2d 222, 223 (6th Cir. 1986), the July 7 notice granted the Mehlbergs an opportunity to respond to the court's reasons for the intended dismissal, and alternatively granted them leave to file a motion to amend the amended third-party complaint.

This matter is now before the court on seven motions arising from the May 8 and July 7 decisions. The court will address the motions in separate discussions of the main action and third-party action.

## I. Main Action and Counterclaim

The court's May 8 grant of summary judgment to the Stones on their TILA rescission claim and the Mehlbergs' counterclaim rested on two grounds. First, the court found that rescissionary rights arose from the failure of Diamond Mortgage Corporation, and by extension, its assignees, the Mehlbergs, to "provide *both* Kenneth and Delores Stone with two copies of the 'right to rescind' forms required by the [Federal Reserve] Board's Regulation Z." (May 8, 1989 Opinion at pp. 10–11, emphasis added). Second, the court concluded that the Mehlbergs' asserted defenses to TILA rescission were unavailing.

The Mehlbergs have filed three documents—a "response" to the court's May 8 opinion, a response to the Stones' motion to strike the Mehlbergs' response, and a motion to vacate—that essentially ask the court to reopen its judgment in the main action. Although the court called its May 8 judgment "final," it was in fact partial and interlocutory, and may be revisited at any time for good cause shown on motion for reconsideration. Fed.R.Civ.P. 54(b). *Cf. Cale v. Johnson,* 861 F.2d 943, 947–48 (6th Cir.1988) (district court may reconsider initial denial of summary judgment simply because it changes its mind). The court will treat the Mehlbergs' submissions as a motion for reconsideration, and the Stones' motion to strike the Mehlbergs' response to the May 8 opinion as opposition to the reconsideration motion.

The Mehlbergs seek reconsideration on the basis of evidence inadvertently absent from the record at the time the court rendered the May 8 judgment. This evidence consists of a "Notice of Right to Cancel" purportedly signed by the Stones during the mortgage transaction at issue. The court has carefully inspected this document, and concludes that it does not undercut the basis of the May 8 judgment.

■ As the court has already found, Diamond was required to provide two copies of his or her rescission rights to both Kenneth and Delores Stone, because both spouses had an ownership interest in their residence. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(b); *Powers v. Sims and Levin,* 542 F.2d 1216, 1219 (4th Cir.1976) (Haynsworth, C.J.) ("[i]n this home improvement loan to the husband and wife, subject to their right of rescission, the creditor was required to make disclosure to each of them"); *Cole v. Lovett,* 672 F.Supp. 947, 952 (S.D.Miss.), *aff'd,* 833 F.2d 1008 (5th Cir.1987).

■ TILA's requirement of two rescission notice copies to each obligor is not a mere technicality. Effective exercise of the right to rescind obviously depends upon the delivery of one copy of the rescission form to the creditor and the retention by the obligor of the other copy. Just as

obviously, each person whose home ownership interest may be compromised by a credit transaction must be informed of his or her rescission rights. The fact that joint obligors may be husband and wife is irrelevant. Spouses are no more interchangeable under TILA's rescission provisions than any other group of persons.

■ The "Notice of Right to Cancel" unearthed by the Mehlbergs contains, directly above the Stones' signatures, the statement "... we received from the creditor two copies of the above notice...." This statement, standing alone, does not suggest that Kenneth Stone received two copies of his rescission rights and Delores Stone received two copies of her rescission rights. Rather, use of the collective pronoun "we" suggests only that Kenneth Stone and Delores Stone together received two copies. If Diamond meant to convey the idea that both Kenneth and Delores Stone received two copies of the "Notice of Right to Cancel," it could have inserted the word "each" between the words "we" and "received," or after the word "copies." *Cf. Morris v. Lomas and Nettleton Co.,* 708 F.Supp. 1198, 1203 (D.Kan.1989) (rescission notice given to husband and wife stating "We have had two copies each of this Rescission Notice ..."). Its failure to do so makes the "Notice of Right to Cancel" fatally defective.

Accordingly, the "Notice of Right to Cancel" does not constitute probative evidence on the issue whether Delores and Kenneth Stone each received the required TILA notice. The only probative evidence on this issue remains the Stones' uncontroverted affidavit testimony that "[p]laintiffs further state that they did not each receive two (2) copies of their rescission rights." This unchallenged testimony establishes the Stones' entitlement to summary judgment. *See Jones v. Lewis,* 874 F.2d 1125, 1128 (6th Cir.1989) (per curiam) (uncontroverted affidavits).

■ Moreover, even if the "Notice of Right to Cancel" did refer to receipt of two copies by both Kenneth and Delores Stone, the document does not suffice to raise a

jury question whether the Stones in fact received the required papers. Under 15 U.S.C. § 1635(c), the Stones' signatures after the acknowledgement of receipt merely created a rebuttable presumption of delivery to them of two copies of the "Notice of Right to Cancel." The Stones' affidavit testimony rebutted this presumption. *Powers v. Sims and Levin Realtors*, 396 F.Supp. 12, 22–23 (E.D.Va.1975), *aff'd in part and rev'd in part*, 542 F.2d 1216 (4th Cir.1976). Following this rebuttal, it is incumbent upon the Mehlbergs, who stand in the creditor's shoes, to produce some positive evidence that delivery of the "Notice of Right to Cancel" copies to the Stones actually did occur. *In re Pinder*, 83 B.R. 905, 912–14 (Bankr.E.D.Pa.1988). The Mehlbergs have not produced any delivery evidence. Consequently, the Stones have established the absence of a genuine factual issue, and are entitled to judgment as a matter of law.

The preceding analysis satisfies the court that the entry of summary judgment for the Stones in the main action and counterclaim was correct on May 8, 1989, and remains correct today. The court will incorporate its May 8 interlocutory judgment into the final judgment that accompanies this supplementary opinion. In accordance with the Stones' motion, the final judgment will include the full legal description of their property to facilitate recording of the judgment and extinguishment of the Mehlbergs' mortgage.

## II. Third–Party Action

The Mehlbergs have responded unartfully, but not ineffectively, to the reasons stated by the court in its July 7 notice of intended sua sponte dismissal. Besides vigorously defending their amended third-party complaint, the Mehlbergs have asked for leave to file a second amended third-party complaint. The court will address the motion to amend before turning to the pending amended complaint. *See Ellison v. Ford Motor Co.*, 847 F.2d 297, 300–01 (6th Cir.1988) (per curiam) (district court should rule on motion to amend before considering merits of pending complaint).

Under Fed.R.Civ.P. 15(a), a party seeking to amend her complaint following the filing of a responsive pleading requires written consent from her adversary or leave of court. The court must grant leave to amend freely when justice so requires. The court may, however, deny a motion to amend if the pleading as amended could not withstand a motion to dismiss. *Head v. Jellico Housing Authority*, 870 F.2d 1117, 1123–24 (6th Cir.1989).

The court concludes that the Mehlbergs' proposed second amended complaint is vulnerable to dismissal for two reasons, jurisdictional and substantive. Initially, the court notes that the second amended complaint attempts to assert different causes of action than the amended complaint. The amended complaint seeks to impose liability on the basis of third-party defendants' alleged primary and secondary violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. In contrast, the second amended complaint abandons all mention of the federal securities laws, and attempts to state causes of action under Michigan's Uniform Securities Act, M.C.L.A. § 451.501 *et seq.*

The second amended complaint's jurisdictional deficiency is as follows. That document does not state or demonstrate an independent jurisdictional basis for the third-party action, but the court may exercise ancillary jurisdiction even though the main action has been dismissed. *Hill v. Rolleri*, 615 F.2d 886, 889 (9th Cir.1980). Where dismissal of the main action has occurred, however, even when dismissal is on the merits the "general rule is to also dismiss the ancillary third party claim." *United States v. Collins & Co. General Contractors*, 648 F.Supp. 967, 971 (M.D. Ga.1986). This rule rests on policy considerations alone because, as the court has noted, dismissal of the main action does not destroy the power to adjudicate an ancillary third-party action.

Applying the relevant policy analysis to the facts of this case, the court concludes

that the proposed second amended complaint could not survive a motion to dismiss made on the basis that the court should not exercise its discretion to hear the third-party claim under principles of ancillary jurisdiction. The second amended complaint raises only state-law claims, and between state and federal forums, "a Michigan forum is better suited to determine questions of Michigan law." *Farrell v. Automobile Club of Michigan,* 870 F.2d 1129, 1134 (6th Cir.1989). In addition, dismissal of the third-party claim would not prejudice the Mehlbergs in terms of discovery or trial preparation, because the third-party action is no closer to trial in this court than it would be if filed anew in state court. *Collins & Co. General Contractors,* 648 F.Supp. at 971–72.

The second amended complaint contains a substantive flaw far less subtle than its jurisdictional shortcomings. Even if the court could properly exercise its discretion to hear the third-party claim, the Mehlbergs' Uniform Securities Act causes of action could not survive a motion to dismiss on the merits. The Uniform Securities Act sections relied upon by the Mehlbergs as a basis of third party defendants' liability, M.C.L.A. §§ 451.501 and 451.809, are criminal provisions that do not create private civil causes of action. *IDS Progressive Fund, Inc. v. First of Michigan Corp.,* 533 F.2d 340, 343 (6th Cir.1976); *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.,* 713 F.Supp. 1019, 1031 (W.D.Mich.1989) (section 451.809 authorizes prosecution by Michigan Attorney General of criminal Uniform Securities Act violations); *Gilbert Family Partnership v. Nido Corp.,* 679 F.Supp. 679, 685 (E.D.Mich.1988).

 Given the preceding discussion, the court will deny the Mehlbergs' motion to amend as futile. It follows that the third-party action must rise or fall on the Mehlberg's currently-pending amended complaint. The amended complaint does not suffer from the jurisdictional deficiency of the proposed second amended complaint outlined above. Because the amended complaint purports to set forth federal securities law violations, rather than the second amended complaint's state-law violations, the amended complaint enjoys an independent jurisdictional basis, and the policy questions concerning whether the court should exercise ancillary jurisdiction are irrelevant.

The court stated in the July 7 notice of intended dismissal that the amended complaint fails to state sufficient claims for relief against third-party defendants E.C. Mackey and James Karpen under a section 10(b) and Rule 10b–5 aiding and abetting theory, because it does not allege they consciously intended by their silence and inaction to aid and abet Diamond/Obie's fraudulent activity. The Mehlbergs' response to this statement has convinced the court to change its mind regarding Mackey, but not Karpen.

The amended complaint alleges that Mackey "was given evidence … that Diamond was engaging in a [sic] unlawful scheme …," and that he "willfully neglected his duty to stop these unlawful acts and alert the public of same." The invocation of Mackey's "willfulness" suffices, barely, to allege that he consciously intended his conduct to aid the primary violators. *Mercer,* 713 F.Supp. at 1033. In contrast, however, the Mehlbergs charge only that Karpen "ignored" relevant evidence and "allowed" Diamond to defraud investors. In light of the "particularly exacting" analysis required in non-disclosure cases, *Moore v. Fenex, Inc.,* 809 F.2d 297, 303 (6th Cir.), *cert. denied sub nom. Moore v. Frost,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987), these allegations do not rise to the level of conscious intent.

 The court will accordingly dismiss Karpen from the third-party suit. Despite the Mehlbergs' success in pleading the requisite state of mind in relation to Mackey, he will also be dismissed. This is because the amended complaint fails to state a claim upon which relief may be granted against any of the alleged primary violators. Absent sufficient allegations of a primary section 10(b) and Rule 10b–5 violation, the aiding and abetting allegations against Mackey cannot survive. *Moore,*

809 F.2d at 303; *Mercer*, 713 F.Supp. at 1033.

The amended complaint seeks to impose primary liability on third-party defendants Peter Sugar, Barton Greenburg, and Leslie Lupovich. In the July 7 notice, the court stated that it intended to dismiss these defendants because the amended complaint failed to provide them with fair notice of the Mehlbergs' fraud claims, in violation of Fed.R.Civ.P. 9(b). The Mehlbergs' response to this stated reason for dismissal persuades the court that they are unable to cure the deficiency.

As the court stated in its May 8, 1989 opinion in this matter,

> [u]nder Fed.R.Civ.P. 9(b), the circumstances constituting fraud must be plead with particularity. In a complex securities fraud case such as this, the particularity need not be great. The fraud claimant need only place the defendant on notice of the general nature of the claim so he or she can reasonably frame a responsive pleading. Nevertheless, at a minimum the fraud claimant should allege "the parties and participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988).

(May 8, 1989 Opinion at 1351). This court has taken "a flexible approach" to Rule 9(b), but the law requires that allegations of fraud amount to something more than a bare legal conclusion. *Mercer*, 713 F.Supp. at 1026.

The court remains convinced under the above principles that the amended complaint fails to satisfy Rule 9(b) in regard to the purported primary violations. The Mehlbergs allege that "Peter Sugar did defraud [them] by representing to Michigan Corporation [sic] and Securities Bureau that Diamond Mortgage was operating legally when in fact it was not. The at-tached letter written and signed by Peter Sugar to James L. Karpen is evidence of our charge." The letter referred to is Sugar's May 12, 1982, response to a proposed Better Business Bureau report on Diamond. The letter describes Diamond's mortgage lending practices and A.J. Obie's regulatory problems, and suggests changes in the Better Business Bureau's report in order to clarify for consumers the differences between Diamond's mortgage business and Obie's securities business.

The amended complaint's allegations against Sugar do not specify any representations other than those made in the May 12, 1982 letter. The Mehlbergs do not explain why they believe the letter's representations were false or misleading. The Mehlbergs fail to say anything about Sugar's intentions save the bare legal conclusion that he "defrauded" them. There is no suggestion that the Mehlbergs relied on Sugar's representations when they decided to invest in A.J. Obie. Consequently, the amended complaint fails to provide Sugar with an adequate basis to determine what he supposedly did wrong under section 10(b) and Rule 10b–5, and Sugar is simply unable to file a coherent answer.

The amended complaint contains similar flaws in relation to Greenburg and Lupovich. The Mehlbergs charge both Greenburg and Lupovich with "defrauding" them by selling them a note backed by the Stones' mortgage, without transferring funds to the Stones. The Mehlbergs' allegations, however, do not identify any representations made by Greenburg and Lupovich. It follows that the amended complaint does not contain any information about the false nature of the representations, the time and place of the representations, the intent with which the representations were made, and any reliance by the Mehlbergs upon the representations. *See Michaels*, 848 F.2d at 679.

The court, and more importantly, the third-party defendants, cannot proceed in this case on the basis of some guess as to what the Mehlbergs mean to claim, rather than what they say in their pleadings. Nor can the court draw upon its knowledge of

other cases to cure the defects in the Mehlbergs' amended complaint. The court is aware of certain facts alleged in the related *Mercer* case that allowed the plaintiffs there to state cognizable fraud claims against the same defendants implicated here in the third-party action. Nevertheless, third-party defendants in the present case are entitled to resolution of this case on the basis of this complaint against them, not the *Mercer* complaint.

The *Mercer* plaintiffs, of course, are represented by competent counsel skilled in drafting a complaint able to survive Rule 12(b)(6) dismissal. When the Stones originally filed this case in the United States District Court for the Eastern District of Michigan, Judge Cook and his magistrate advised the Mehlbergs to find a lawyer. After the matter was transferred here, this court repeatedly urged the Mehlbergs to obtain competent representation, and in fact persuaded counsel in the *Mercer* action to take on the Mehlbergs as clients if the Mehlbergs would agree to that arrangement. In response to this effort on their behalf, the Mehlbergs have chosen to persevere in representing themselves, and have explicitly expressed their contempt for the legal profession.

This case cannot remain in the pleading stage indefinitely. The Mehlbergs, after three attempts, have established that they cannot state a claim for relief. Accordingly, any further indulgence by the court of the Mehlbergs because of their pro se status is simply unfair to third-party defendants. The court will dismiss the third-party action with prejudice. *See generally Wells v. Brown,* 891 F.2d 591, 593–94 (6th Cir.1989).

### III. Conclusion

In light of the foregoing, the Stones' motion to amend the May 8, 1989 judgment in the main action and counterclaim is granted. The Mehlbergs' motion to vacate that judgment is denied. In the third-party action, the Mehlbergs' motion to amend the amended third-party complaint is denied. The motions to dismiss filed by third-party defendants Mackey, Karpen, and Sugar are granted. The court intends the accompa-

nying judgment to be final and appealable in all respects. The court will not entertain any further motions in this matter other than those post-judgment motions specifically authorized by the Federal Rules of Civil Procedure.

### FINAL JUDGMENT

In accordance with the opinion, orders, and partial judgment filed May 8 and July 7, 1989, and with the supplementary opinion filed this date,

IT IS ORDERED that judgment is entered for counter-defendants Delores Stone and Kenneth Stone, and against counter-plaintiffs Mary Mehlberg and Frank Mehlberg, on the counterclaim brought by the Mehlbergs to enforce the promissory note executed by the Stones on March 14, 1986, and assigned to the Mehlbergs by Diamond Mortgage Corporation on March 25, 1986.

IT IS FURTHER ORDERED that judgment is entered for defendants Mary Mehlberg and Frank Mehlberg, and against plaintiffs Delores Stone and Kenneth Stone, on the Stones' claim for damages under the Truth in Lending Act.

IT IS FURTHER ORDERED that judgment is entered for plaintiffs Delores Stone and Kenneth Stone, and against defendants Mary Mehlberg and Frank Mehlberg, on the Stones' claim for rescission under the Truth in Lending Act of their March 14, 1986 loan transaction with Diamond Mortgage Corporation.

IT IS FURTHER ORDERED that the promissory note executed by Delores Stone and Kenneth Stone on March 14, 1986, and assigned to Mary Mehlberg and Frank Mehlberg by Diamond Mortgage Corporation on March 25, 1986, is cancelled.

IT IS FURTHER ORDERED that the mortgage executed by Delores Stone and Kenneth Stone on March 14, 1986, and assigned to Mary Mehlberg and Frank Mehlberg by Diamond Mortgage Corporation on March 25, 1986, thus encumbering the Stones' title to the property located at 58580 Chennault, New Haven, Michigan, legally described as:

Lot 123 Chennault Subdivision No. 1, as recorded in Liber 47, Page 40 of Plats, Macomb County Records, Village of New Haven, Macomb County, Michigan,

is discharged, and the encumbrance is void.

IT IS FURTHER ORDERED that judgment is entered for third-party defendants E.C. Mackey, James Karpen, Peter Sugar, Barton Greenburg, and Leslie Lupovich, and against third-party plaintiffs Mary Mehlberg and Frank Mehlberg, on the Mehlbergs' third-party securities fraud indemnity claim.

IT IS FURTHER ORDERED that all parties shall bear their own costs.