**Harold MERCER, et al., Plaintiffs,**

v.

**JAFFE, SNIDER, RAITT AND HEUER, P.C., et al., Defendants.**

**Robert N. SCHRIEMER, et al., Plaintiffs,**

v.

**Barton GREENBERG, et al., Defendants.**

**Nos. G88–380 CA1, G87–56 CA1.**

United States District Court, W.D. Michigan, S.D.

April 30, 1990.

Thomas F. Koernke, Todd Dickinson and James R. Doezema, Tolley, Fisher & Verwys, P.C., and Sharon H. Norris, Norris & Associates, P.C., Grand Rapids, Mich., for plaintiffs.

Morton H. Collins, Collins, Einhorn & Farrell, Southfield, Mich., for Jaffe, Snider, Raitt and Heuer, P.C.

Ronald W. Emery, Asst. Atty. Gen., Tort Defense Div., Lansing, Mich., for Frederick Hoffecker.

John D. Walter, Asst. Atty. Gen., Executive Div., Lansing, Mich., for James Karpen.

Bruce M. Bieneman, Cholette, Perkins & Buchanan, Grand Rapids, Mich., for Ronald M. Barron and Ronald M. Barron & Associates, P.C.

George H. Weller, Asst. Atty. Gen., for the State of Mich.

Annis, Annis & Visser, Comstock Park, Mich., for George J. Yusko.

Erwin A. Rubenstein and Arnold F. Farwell, Southfield, Mich., for Ernst & Co.

Moll Desenberg Bayer & Behrendt by Rodger D. Young, Richard A. Kay and Terrance R. Bacon, Southfield, Mich., for Follmer, Rudzewicz & Co.

Andrew S. Conway, Miro Miro & Weiner, Bloomfield Hills, Mich., for George Hamilton.

Steven L. Schwartz, Farmington Hills, Mich., for Cohen & Leff, P.C.

## OPINION ON SUMMARY JUDGMENT MOTIONS

HILLMAN, Chief Judge.

These consolidated actions arise from the so-called Diamond Mortgage Corporation ("Diamond")/A.J. Obie & Associates, Incorporated ("Obie"), mortgage-backed securities fraud. As the court has explained elsewhere in more detail, Diamond, Obie, and Commerce Mortgage Investments, Limited ("CMI") (collectively, "the Diamond entities") were an interrelated group of now-bankrupt corporations controlled by defendant Barton Greenberg. Obie was a retail securities broker/dealer that marketed individual home equity promissory notes and mortgages solicited by Diamond, a mortgage broker. Obie also marketed shares issued by CMI, a real estate investment trust that held notes and mortgages transferred from Diamond. For a general description of the Diamond entities' operations, see *Stone v. Mehlberg*, 728 F.Supp. 1341 (W.D.Mich.1990) and *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.*, 713 F.Supp. 1019 (W.D.Mich.1989), *later proceeding*, 730 F.Supp. 74 (W.D.Mich.1990).

Plaintiffs are hundreds of investors who purchased now-worthless Diamond-generated "first mortgage notes" or CMI shares. Many of the original defendants in these actions have been or will be dismissed by stipulation or on motion. Those remaining, in addition to Barton Greenberg, include Ronald M. Barron and Ronald M. Barron & Associates, P.C. (collectively, "the Barron defendants"), a lawyer and law firm who represented the Diamond entities. Also remaining as defendants are James Karpen, former Director of Enforcement of the Michigan Corporations and Securities Bureau ("MCSB"), and Frederick Hoffecker, Assistant in Charge of the Michigan Attorney General's Consumer Protection Division (collectively, "the state defendants"). Karpen regulated the Diamond entities' sale of securities under the Michigan Uniform Securities Act, Mich.Comp.Laws Ann. § 451.501 *et seq.*, while Hoffecker monitored the Diamond entities' compliance with the Michigan Consumer Protection Act, Mich.Comp.Laws Ann. § 445.901 *et seq.*

The "Fourth Amended Complaints" filed in both the *Mercer* and *Schriemer* actions contain a potpourri of claims. Both the *Mercer* and *Schriemer* plaintiffs focus, however, upon allegations that the Barron defendants and state defendants defrauded them, or aided and abetted the Diamond entities in defrauding them, in violation of Michigan common law and section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5.

The matter is before the court on summary judgment motions filed by both the Barron defendants and the state defendants. Greenberg has defaulted in both consolidated actions. *See Mercer*, 730 F.Supp. at 78–79. Greenberg will not be considered further in this opinion, and unless stated otherwise, he is not included in any reference below to "defendants" in these actions. Plaintiffs have responded to the pending motions. The Barron defendants and the state defendants have replied to plaintiffs' responses.

The court has carefully considered the able arguments of counsel and the key evidence of record. The court previously addressed many of the legal and factual questions raised in the present motions on defendants' motions to dismiss granted in part and denied in part on May 3, 1989. *See Mercer*, 713 F.Supp. at 1021–33. At that time, in light of the undeveloped record, plaintiffs' grievous losses, and the complexity of the issues, the court gave plaintiffs every benefit of the doubt to allow them an opportunity to flesh out through discovery their many vague and generalized fraud claims. Following discovery, however, the court is now convinced that summary judgment should issue for the Barron defendants and the state defendants on all remaining claims as detailed below.

## A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Sixth Circuit recently explained in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–81 (6th Cir.1989), a trio of 1986 Supreme Court decisions inaugurated a "new era" in federal summary judgment practice. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);

*Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court will not repeat *Street*'s thorough analysis of these Supreme Court decisions and the emerging contours of summary judgment's "new era." Rather, the court will note several summary judgment principles recited in *Street* that appear to be particularly applicable to these actions.

First, summary judgment is not necessarily inappropriate because this litigation is complex and involves questions of intent. *Street*, 886 F.2d at 1479. Second, if defendants show that plaintiffs lack evidence to support an essential element of their fraud claims, plaintiffs must come forward with more than a "scintilla" of affirmative evidence to survive defendants' motions, and the court is not required to search the record for such evidence. *Id.* at 1479–80. Plaintiffs' evidence must consist of specific facts, not speculation. *Id.; Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc.*, 863 F.2d 439, 444 (6th Cir.1988). Third, if plaintiffs' evidence could reasonably lead the jury to find in their favor, the court should deny the motions. On the other hand, if the evidence remains so one-sided in defendants' favor that the jury could not reasonably find for plaintiffs, the court should grant the motions. *Street*, 886 F.2d at 1479, 1480. Finally, in predicting whether the jury could find for plaintiffs, the court enjoys some discretion to determine whether plaintiffs' claims are contextually "implausible," although that discretion must be exercised with great caution. *Id.* at 1480 and n. 21; *In re Fortune Systems Securities Litigation*, 680 F.Supp. 1360, 1368 (N.D.Cal. 1987).

## B. The State Defendants

The state defendants, Karpen and Hoffecker, remain in this litigation by virtue of Count II of the "Fourth Amended Complaint" filed by plaintiffs in the *Mercer* consolidated action. Count II alleges that the state defendants "aided and abetted" the Diamond entities' Rule 10b–5 violations. In the Sixth Circuit, Rule 10b–5

aiding and abetting liability carries three essential elements: 1) the commission by some other person of a "primary" Rule 10b–5 violation, 2) general awareness of the primary violation by the accused aider-abettor, and 3) knowing and substantial assistance to the primary violation by the accused aider-abettor. *Mercer*, 713 F.Supp. at 1033 (citing *Moore v. Fenex, Inc.*, 809 F.2d 297, 303 (6th Cir.), *cert. denied sub nom. Moore v. Frost*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987)).

Karpen contends as a threshold matter that the *Mercer* plaintiffs' Count II claims fail on the first element of aiding and abetting liability. He argues that the Diamond entities did not primarily violate Rule 10b–5 because the investments those entities sold to the *Mercer* plaintiffs are not "securities." *See Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 493 (6th Cir.1990) (existence of a "security" an essential element of primary Rule 10b–5 claim). The court finds Karpen's argument unpersuasive.

■ The Securities Exchange Act of 1934 defines a "security" as, among other things, any "note" or "stock." *See* 15 U.S.C. § 78c(a)(10). Although this definition is not to be taken literally, *American Bank & Trust Co. v. Wallace*, 702 F.2d 93, 94 (6th Cir.1983), it must be liberally construed to harmonize with Congress' purpose to extend the Exchange Act's reach to "encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, — U.S. —, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990).

■ The court notes initially that Karpen does not attempt to distinguish between the Diamond "first mortgage notes" and the CMI shares marketed by Obie and purchased by the *Mercer* plaintiffs. On their faces, these two categories of instruments are quite different. According to CMI's August 15, 1980 Offering Circular, CMI shares are denominated "common stock." Also according to the Circular, the purchase of CMI common stock creates the right to receive dividends dependent upon CMI profits, along with the right to vote at shareholder meetings in proportion to the

number of shares held. The Circular states that CMI common stock is "transferable," and Karpen does not assert that the stock cannot be pledged and is not negotiable. *Cf. Reves*, 110 S.Ct. at 953 (nonnegotiable but transferable share a "security") (citing *Tcherepnin v. Knight*, 389 U.S. 332, 337, 88 S.Ct. 548, 553–54, 19 L.Ed.2d 564 (1967)). Nothing in the record suggests that CMI shares did not, at least at the time of the *Mercer* plaintiffs' purchases, carry the capacity to appreciate in value.

Under these circumstances, the *Mercer* plaintiffs' shares of CMI common stock qualify as "securities" within the meaning of the Exchange Act. "[W]hen an instrument is both called 'stock' and bears stock's usual characteristics, 'a purchaser justifiably [may] assume that the federal securities laws apply.'" *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686, 105 S.Ct. 2297, 2302, 85 L.Ed.2d 692 (1985) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 850, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975)).

■ As for the Diamond "first mortgage notes," the parties correctly contend that the Supreme Court's recent *Reves* decision is controlling. In *Reves* the Court split on the question whether the instruments at issue were exempt from coverage under the Exchange Act, but all nine justices joined the section of Justice Marshall's majority opinion adopting the Second Circuit's "family resemblance" test as the general framework for deciding when a "note" satisfies the statutory definition of a "security." 110 S.Ct. at 951–52.

Under the "family resemblance" analysis, an instrument denominated a "note" is presumed to be a "security" unless 1) the note bears a strong resemblance, in terms of four factors considered in the *Reves* decision, to one of the Second Circuit's already-enumerated categories of non-securities, or 2) consideration of the same four factors shows that the note should be added to the list of non-securities. *Id.* at 952. The four factors bearing upon an instrument's status as a security or non-security are the motivations of the buyer and seller

in exchanging the instrument, the instrument's plan of distribution, the reasonable expectations of the investing public, and the existence of some other regulatory scheme that significantly reduces the risk of the instrument. *Id.* at 951–52.

Among the already-enumerated categories of non-securities cited by the *Reves* Court is "the note secured by a mortgage on a home." *Id.* at 951 (citing *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir.1976)). Karpen, not surprisingly, seizes upon this language to argue that the "first mortgage notes" issued by Diamond are *per se* non-securities, and the court need not even consider the four-factor "family resemblance" test. As Karpen's counsel asks rhetorically, when the United States Supreme Court gives "the note secured by a mortgage on a home" as an example of the type of note that is not a security, what more is there to say?

As it happens, there is much more to say. The Court remarked in *Reves* that the Second Circuit's list of non-securities is " 'not graven in stone,' ... and is therefore capable of expansion." *Id.* 110 S.Ct. at 951 (quoting *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)). If the list of non-securities is capable of expansion, it is also capable of interpretation. This court holds that the Supreme Court in *Reves* and the Second Circuit in *Exchange National Bank* did not have in mind the type of mortgage-backed note at issue in these cases when they listed notes "secured by a mortgage on a home" as non-securities. Rather, it appears that they intended their example to apply only to mortgage-backed notes in the context of a traditional face-to-face loan transaction between a borrower and commercial or consumer lender, not in the present context of a transaction between an individual investor and a broker/dealer selling the notes on a mass market basis. *See Stone*, 728 F.Supp. at 1344–45 (describing Diamond/investor relationship).

The pre-*Reves* case law, including dicta from Justice Stevens, supports this contextual distinction. *See Landreth Timber Co.*, 471 U.S. at 698–99, 105 S.Ct. at 2312–13 (Stevens, J., dissenting) ("[t]he negotiation of an individual mortgage note, for example, surely would not be covered by the [Exchange Act].... [t]he marketing to the public of a large portfolio of mortgage loans, however, might well be"). *Compare Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434 (9th Cir. 1978) ("[a] note given to a lender in the course of a commercial financing transaction is not a security within the meaning of the federal securities laws") *with Hall v. Security Planning Service, Inc.*, 371 F.Supp. 7, 14 (D.Ariz.1974) (mortgage-backed notes given to lender by lot purchasers and sold by lender to thousands of investors are "securities" as defined by Exchange Act).

It could be contended that the foregoing interpretation leads to the "illogical" result that a mortgage-backed note is not a security at the time a borrower gives it to his lender, but may become a security when the lender or other commercial assignee transfers it to a retail broker/dealer, who then sells it to her customer. The court, however, sees nothing anomalous in such a situation. As the *Reves* Court noted, "notes" are used in a variety of settings, and as a matter of economic reality some of these involve investments, and some do not. 110 S.Ct. at 950. The *Reves* Court appeared perfectly comfortable with the idea that its "economic reality" approach means that "whether a particular note is a 'security' may not be entirely clear at the time it is issued." *Id.* at 950 n. 2. In fact, the Court pointed out that some initial uncertainty about the status of a note at the time of its creation carries the advantage of extending Exchange Act coverage to those who *market* instruments that may not have originally fit within the statutory definition. *Id.*

In light of the foregoing, the court is satisfied that the inclusion of "the note secured by a mortgage on a home" on the list of non-securities in *Reves* does not preclude inquiry into whether Diamond's "first

mortgage notes" are "securities" under the "family resemblance" test. Applying this test, the court concludes that Karpen has not rebutted the presumption that the notes at issue here are securities entitled to the protections of the Exchange Act. In terms of the four factors recited in *Reves,* Diamond "first mortgage notes" bear little resemblance to the mortgage-backed note given by a borrower to his lender in a typical home equity loan transaction. Similarly, the same four factors do not suggest that the notes at issue here should join the judicially-enumerated list of non-securities.

On the first factor, the parties' motivations in exchanging the note, no doubt exists that the *Mercer* plaintiffs "bought [Diamond notes] in order to earn a profit in the form of interest." *Reves,* 110 S.Ct. at 952. The record shows that Diamond sold the notes ostensibly in order to collect fees from note purchasers for servicing their mortgages. Diamond also apparently kept the entire note purchase net proceeds in those cases in which it operated as the mortgage "lender" as well as a broker. *See Stone,* 728 F.Supp. at 1344. Karpen does not contend that Diamond did not intend to use its revenues for general business purposes or to finance investment, chiefly the purchase of additional mortgages. *See Reves,* 110 S.Ct. at 951. Accordingly, "[f]rom both sides, then, the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Id.* at 953.

On the second factor of the "family resemblance" test, the Diamond notes' plan of distribution, an instrument in which "common trading for speculation or investment" exists will ordinarily be a "security." *Id.* at 952. Here, the "common trading" requirement is established by the fact that the "first mortgage notes" were "offered and sold to a broad segment of the public." *Id.* at 953. The third factor, the public's reasonable perceptions, also supports a finding that the notes in these cases are "securities." Diamond's March 23, 1982 Offering Circular states "The First Mortgage Notes are deemed to be 'securities' as defined by state and federal securities laws

and their offering and sale to the public is subject to the ... antifraud provisions of state and federal securities laws." In these circumstances, "it would be reasonable for a prospective purchaser to take [Diamond] at its word." *Id.*

Finally, on the "family resemblance" test's fourth factor, the theoretical collateralization of Diamond "first mortgage notes" is admittedly a "risk-reducing factor" not normally associated with "securities." *Id.* The problem in these cases, of course, is that purchasers were in fact unsecured because Diamond assigned them fraudulent mortgages to secure their notes. The Supreme Court has taken a practical approach to application of the fourth factor; the pertinent inquiry appears to be whether the "risk-reducing factor" "render[s] application of the Securities Acts unnecessary." *Id.* at 952; *Marine Bank v. Weaver,* 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) (unanimous) ("[i]t is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws").

Karpen mentions several regulatory schemes that protected the makers of Diamond "first mortgage notes," but none that protect holders in the *Mercer* plaintiffs' position like the federal banking laws that protected the bank certificate holders in *Marine Bank.* Consequently, application of the Exchange Act is anything but "unnecessary" in these actions, and the fourth *Reves* factor militates in favor of finding that Diamond "first mortgage notes" are securities.

In sum, the court holds that the CMI shares and Diamond "first mortgage notes" involved in this litigation qualify respectively as "stock" and "notes" within the Exchange Act's definition of a "security." The court therefore need not reach the *Mercer* plaintiffs' contention that these instruments are also "investment contracts." It follows that the *Mercer* plaintiffs' Count II Rule 10b–5 aiding and abet-

ting claims do not fail on this threshold issue.

With the exception of Karpen's argument regarding the definition of a "security," the state defendants do not seriously contest the first element of the *Mercer* plaintiffs' Count II claims, the commission by the Diamond entities of at least one primary Rule 10b–5 violation. According to the *Mercer* plaintiffs, the Diamond entities committed numerous primary violations, generally involving untrue statements and misleading omissions contained in the Diamond entities' offering circulars and promotional materials, to the effect that the Diamond entities were solvent and profitable, that Diamond notes were completely secured by a single, valid, properly assigned residential first mortgage, and that CMI invested only in similarly secured investments. *See generally Stone*, 728 F.Supp. at 1344–45; *Mercer*, 713 F.Supp. at 1021–23.

■ The state defendants vigorously dispute, however, the second and third elements of the *Mercer* plaintiffs' Count II claims. They contend that the *Mercer* plaintiffs lack sufficient evidence to create a jury question on Karpen's and Hoffecker's alleged general awareness of, and knowing and substantial assistance to, the primary violations. Both Karpen and Hoffecker have submitted sworn testimony denying any knowledge of or participation in fraud, along with detailed analyses of asserted defects in the evidence supporting the *Mercer* plaintiffs' claims. These submissions satisfy the state defendants' initial summary judgment burden. Accordingly, the *Mercer* plaintiffs must, in order to avoid summary judgment, come forward with more than a scintilla of specific, probative fact to buttress their allegations of the state defendants' scienter. *Street*, 886 F.2d at 1479. The court agrees with the state defendants that the *Mercer* plaintiffs have not carried their burden.

Nothing in the record suggests that Hoffecker was generally aware at any time of securities fraud committed by the Diamond entities. "General awareness" in this context is a term of art encompassing two categories of scienter, actual knowledge and "reckless failure to know," both of which satisfy Rule 10b–5's scienter requirement. *See Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir.1979). "Recklessness" in turn means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025.

The record shows unequivocally that it was not Hoffecker's job to protect persons in the *Mercer* plaintiffs' position. Rather, it was the MCSB, not Hoffecker's agency, the Attorney General's Consumer Protection Division, that had jurisdiction over the Diamond entities' securities offerings. The Consumer Protection Division regulated only Diamond's mortgage lending practices. The *Mercer* plaintiffs have not produced any specific facts contradicting Hoffecker's testimony that he never read the Diamond entities' offering circulars or promotional materials, had no knowledge of any representations made by Obie or anyone else regarding Diamond and CMI securities, and knew nothing about the November 30, 1981 Consent Order in which the Diamond entities settled an MCSB administrative action against them by agreeing to conform their operations to Michigan securities law. Consequently, the *Mercer* plaintiffs have not raised a jury issue on the actual knowledge portion of the Rule 10b–5 aiding and abetting "general awareness" requirement.

The *Mercer* plaintiffs nevertheless contend that evidence exists from which the jury could find that Hoffecker acted recklessly by failing to discover and disclose that Diamond was misrepresenting the secured nature of its notes. The evidence cited by plaintiffs includes 1) Hoffecker's knowledge that Obie marketed Diamond's mortgages, 2) his knowledge, gleaned from his regulatory duties regarding Diamond's mortgage lending activity, that Diamond sometimes failed to disburse loan funds to borrowers, and 3) his occasional receipt of unspecified "complaints" from Obie investors. From this evidence, the *Mercer* plaintiffs argue, the jury could infer that Hoffecker recklessly failed to deduce that Dia-

mond was fraudulently assigning undisbursed and thus invalid mortgages to investors.

The court finds that the evidence cited does not raise a reasonable inference of recklessness. The record shows that Hoffecker simply did not concern himself with the investing side of the Diamond entities' business. When a borrower brought an undisbursed mortgage to Hoffecker's attention, Hoffecker saw to it that the borrower received the promised funds or that Diamond discharged the mortgage, and eventually he sued Diamond to ensure that its mortgage lending practices would comply with applicable law. *See Stone*, 728 F.Supp. at 1345. Hoffecker did not inquire whether the mortgage had been assigned to an investor. Rather, investor complaints received at the Consumer Protection Division were passed along without comment to the MCSB for investigation and resolution. Unfortunately for everyone concerned in these cases, the MCSB and the Consumer Protection Division did not coordinate their regulatory efforts.

Perhaps Hoffecker was less than perspicacious, even negligent, in failing to discern that problems in some underlying loan transactions could affect the truth or falsity of the Diamond entities' representations about their securities. The jury could not reasonably conclude, however, that Hoffecker's practice of keeping solely within his agency's own bureaucratic bailiwick, mortgage lending, and leaving representations concerning securities to the agency responsible for policing the securities markets, the MCSB, was highly unreasonable conduct amounting to an extreme departure from the standards of due care. Accordingly, Hoffecker is entitled to summary judgment on Count II of the *Mercer* "Fourth Amended Complaint."

The *Mercer* plaintiffs' Rule 10b–5 aiding and abetting claims likewise cannot survive James Karpen's summary judgment motion. In reaching this conclusion, the court notes initially the uncontradicted testimony of Robert Ianni, a prosecutor who worked on the successful state criminal fraud action brought against Barton Greenberg and others following the Diamond entities' financial collapse in mid–1986. Ianni stated that Karpen spearheaded the MCSB investigation that precipitated exposure of the fraud. He further concluded that Karpen's efforts provided "invaluable assistance" to the prosecution, which Karpen "aggressively encouraged." If Karpen had indeed aided and abetted the Diamond entities' fraud, it defies common sense to suppose that he would voluntarily work against his own interest, exposing himself to potential criminal liability, by encouraging investigation and conviction of the fraud's principals. Accordingly, Ianni's testimony renders the *Mercer* plaintiffs' Count II claims against Karpen highly implausible. *See Street*, 886 F.2d at 1480 and n. 21. In light of this testimony, the evidence against Karpen would have to be compelling indeed for the jury to reasonably find that he aided and abetted the Diamond entities' fraud.

The evidence cited by the *Mercer* plaintiffs in support of their Count II claims is not compelling. The record does not contain direct evidence showing that Karpen knew or was reckless in not knowing that the Diamond entities were misrepresenting their solvency and the secured nature of Diamond first mortgage notes and CMI holdings. *Cf. Moore*, 809 F.2d at 305 (general awareness of financial and management problems at securities issuer directly established by aider-abettor's personal notes showing knowledge that issuer lacked "business identity and honesty of operation"). Rather, the *Mercer* plaintiffs point essentially to nothing more than Karpen's awareness of Diamond's and CMI's difficulty in obtaining certified financial statements, along with Karpen's review of Diamond's September 15, 1982 "tentative draft" financial statement. This latter document could be reasonably interpreted to show that Diamond was in questionable financial shape, and possibly failing to secure new Obie investors, as of April 30, 1982. Two of Karpen's MCSB subordinates, Ronald Rubach and Gerald Sheppard, did so interpret the tentative draft statement, although Karpen did not.

The problems surrounding the Diamond entities' financial statements raise a legit-

imate issue regarding whether Karpen should have known of the Diamond entities' fraud. "Should have known," however, does not connote anything beyond negligence. In order for the *Mercer* plaintiffs to make the "quantum leap" to demonstration of a reasonable inference that Karpen acted with the requisite Rule 10b–5 scienter, they must point to something in addition to evidence that could support a negligence finding. *See Moore,* 809 F.2d at 306. In other words, the *Mercer* plaintiffs' evidence of Karpen's negligence vis a vis the Diamond entities' financial statements, plus something else, might support an inference that Karpen knew or recklessly failed to know of the fraud at issue here.

For example, the *Mercer* plaintiffs' financial statements evidence might suffice to show scienter in conjunction with some showing that Karpen's conduct in regulating the Diamond entities was improper or highly unusual. As the Sixth Circuit stated in its discussion of the "general awareness" element of Rule 10b–5 aiding and abetting liability in *Securities and Exchange Commission v. Washington County Utility District,* 676 F.2d 218, 226 (6th Cir.1982), "[i]f the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential.... Conversely, if the alleged aider and abettor conducts a transaction of an extraordinary nature, less evidence of his complicity is necessary." *See also Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975) ("[i]f the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability").

Alternatively, the financial statements evidence suggesting that Karpen should have had knowledge of the fraud might suffice to allow a jury finding of scienter in conjunction with some supporting evidence that Karpen benefitted from the fraud. As the Seventh Circuit stated in rejecting a

claim that an adequate inference of scienter arose on the basis of evidence that accused Rule 10b–5 aider-abettors "must have known" of fraud, "[t]he plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators." *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986) (affirming district court's grant of summary judgment).

The present record would not allow the jury to find either of these additional factors. The evidence establishes that Karpen's conduct in relation to the Diamond entities was entirely within the ordinary course of his duties as MCSB Enforcement Director. Although in hindsight the MCSB appears to have been unusually lenient in allowing the Diamond entities time and breathing space to achieve ostensible compliance with Michigan securities law, this leniency was not marked by any "transaction[s] of an extraordinary nature." *Washington County Utility District,* 676 F.2d at 226. All actions taken by Karpen occurred following open consultation with his staff and his superior, MCSB Director E.C. Mackey. Nothing in the testimony of Mackey, or of Rubach and Sheppard, the subordinates who first concluded that the Diamond entities were engaged in fraud, suggests that they considered Karpen's actions remarkable in any way. Certainly the facts here do not reflect anything like the glaring conflict of interest and receipt of secret kickbacks prominent in the *Washington County Utility District* record. *Id.*

Similarly, the record contains nothing upon which the jury could reasonably conclude that Karpen stood to gain by "bilking" the *Mercer* plaintiffs. *See Barker,* 797 F.2d at 497. Karpen was not being paid by the Diamond entities. *Id.* He in fact had "everything to lose" by "join[ing] common cause" with the Diamond entities, including his professional reputation and perhaps even his personal liberty. *Id.* Under these circumstances, "it is inconceivable that [Karpen] joined a venture to feath-

er [his nest] by defrauding" investors in Diamond and CMI securities. *Id.*

In light of the foregoing, the *Mercer* plaintiffs have not presented evidence adequate to allow the jury to return a reasonable verdict in their favor on Count II's implausible claims that Karpen aided and abetted the Diamond entities' fraud. As with Hoffecker, summary judgment will issue for Karpen.

### C. The Barron Defendants

The Barron defendants are a lawyer and law firm who represented the Diamond entities on various matters from the 1970s until their demise in 1986. Ronald Barron also acted from time to time as Barton Greenberg's personal attorney. The Barron defendants are named in Counts I, II, III, and V of the "Fourth Amended Complaint" filed in the *Schriemer* consolidated action. Counts I and II respectively allege Rule 10b–5 primary and aiding and abetting liability. Count III states common law fraud claims, and Count V asserts common law conspiracy. Like the state defendants, the Barron defendants have satisfied their initial summary judgment burden. Accordingly, like the *Mercer* plaintiffs, the *Schriemer* plaintiffs must now "put up or shut up" by demonstrating the evidentiary basis of their claims. *Street,* 886 F.2d at 1478.

The court finds initially that the Barron defendants are entitled to summary judgment on the *Schriemer* plaintiffs' Count III and Count V state-law claims. The *Schriemer* plaintiffs have clearly geared their discovery and legal argument exclusively towards Rule 10b–5, not common law doctrines. They make no effort to identify specific facts that would allow the jury to find the elements of Michigan common law fraud and civil conspiracy. For example, plaintiffs point to nothing that suggests an express, implied, or ratified *combination* between any defendants, an essential element of Michigan conspiracy law. *Mercer,* 713 F.Supp. at 1030 (citing *Fenestra Inc. v. Gulf American Land Corp.,* 377 Mich. 565, 141 N.W.2d 36, 48 (1966)). *See Liuzzo v. United States,* 565 F.Supp. 640, 647 (E.D.Mich.1983). Similarly, plaintiffs do not attempt to connect their evidence to the complex elements of Michigan common law fraud or silent fraud. *See Mercer,* 713 F.Supp. at 1028 (citing *U.S. Fidelity and Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 82 (1981)). Indeed, the *Schriemer* plaintiffs cite no Michigan cases in their brief opposing summary judgment. Under these circumstances, plaintiffs have abandoned their Count III and Count V claims. *Vaughn v. Mobil Oil Exploration and Producing Southeast, Inc.,* 891 F.2d 1195, 1198 (5th Cir.1990) ("[w]e can only construe appellee's failure to urge its claims before the district court as an intention to abandon that part of its case"). Even if the *Schriemer* plaintiffs have not abandoned these claims, there is simply no showing that the jury could return a favorable verdict upon them.

Some doubt exists about whether, as a matter of law, the *Schriemer* plaintiffs may establish the Barron defendants' liability for the "primary" violations of Rule 10b–5 pleaded in Count I of the "Fourth Amended Complaint." First of all, the application of *respondeat superior* in the Rule 10b–5 context is not crystal clear. *See Mercer,* 730 F.Supp. at 77–78. It might therefore be that Ronald M. Barron & Associates, P.C., cannot be held vicariously liable on Count I, or for that matter, on Count II, for the acts of its principal, Ronald Barron.

Secondly, the courts have expressed diverse views concerning the circumstances in which an attorney or law firm may incur primary Rule 10b–5 liability to securities purchasers in the course of representing a securities issuer or underwriter. An obvious concern exists that recognition of a lawyer's duty to third-party investors may adversely affect the lawyer/client relationship. *Cf. Mercer,* 713 F.Supp. at 1029 (citing *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585, 590–93 (1981)) (lawyer representing one party in arm's length business transaction owes no actionable duty to other party under Michigan negligence law).

Generally speaking, primary liability requires "direct contacts" between the violator and a security purchaser. *Washington*

*County Utility District,* 676 F.2d at 222–24 (discussing *Securities and Exchange Commission v. Coffey,* 493 F.2d 1304 (6th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975)). The Sixth Circuit has stated in dicta that "[d]irect contacts may take many forms. [A] ... lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a securities purchaser." *Coffey,* 493 F.2d at 1315 n. 24. The Sixth Circuit has not explained, however, what it meant by "preparation" of a "statement." *Compare Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1123–26 (5th Cir.1988), *vacated in part on other gds. sub nom. Fryar v. Abell, cert. denied in part sub nom. Abell v. Wright, Lindsey & Jennings,* —— U.S. ——, 109 S.Ct. 3236, 3242, 106 L.Ed.2d 584, 589 (1989) (bond underwriters' counsel not primarily liable under Rule 10b–5 for failure to correct misleading prospectus statements where it did not sign prospectus or accompanying documents and did not prepare formal written legal opinion for benefit of bond purchasers) *with In re Flight Transportation Corp. Securities Litigation,* 593 F.Supp. 612, 617–18 (D.Minn. 1984) (plaintiffs stated cognizable claim of primary Rule 10b–5 liability against underwriters' counsel who "assisted in preparation" of false prospectuses; no evidence that counsel signed prospectus or other relevant document or prepared formal opinion).

■ Fortunately, the court need not chop through these legal thickets. Whatever the precise contours of the applicable law, the factual record here unmistakably shows that the Barron defendants did not primarily violate Rule 10b–5. The *Schriemer* plaintiffs fail to identify any specific instance when the Barron defendants made or in any sense "prepared" untrue statements or misleading omissions in connection with the purchase or sale of Diamond or CMI securities. The record in fact reflects that the Barron defendants had nothing to do with the Diamond entities' offering circulars or promotional materials, which were prepared and reviewed by other counsel. The *Schriemer* plaintiffs assert that Ronald Barron drafted a predecessor to Diamond's March 23, 1982 Offering Circular, but they have not provided the court with a copy of that alleged document, nor have they detailed any false statements or omissions contained therein. The Barron defendants accordingly were not in "direct contact" with the *Schriemer* plaintiffs and assumed no primary duty to them under Rule 10b–5. *Washington County Utility District,* 676 F.2d at 223–24. The court will grant the Barron defendants summary judgment on Count I of *Schriemer*'s "Fourth Amended Complaint."

■ As for the *Schriemer* plaintiffs' Count II Rule 10b–5 aiding and abetting claims against the Barron defendants, the record likewise does not contain more than a scintilla of specific evidence that could support a jury finding of liability. Like the state defendants, the Barron defendants do not substantially dispute the *Schriemer* plaintiffs' claims on the first element of Rule 10b–5 aiding and abetting. The *Schriemer* plaintiffs, like the *Mercer* plaintiffs, generally claim that the Diamond entities misrepresented to investors their solvency and the secured nature of Diamond "first mortgage notes" and CMI holdings. In addition the *Schriemer* plaintiffs vaguely allege certain minor irregularities that supposedly amounted to primary Rule 10b–5 violations, such as CMI's failure to observe corporate formalities and the Diamond entities' numerous violations of technical regulatory requirements. Like the state defendants, however, Ronald Barron denied at deposition any knowledge of or participation in the Diamond entities' primary violations, the gravamen of the second and third elements of the *Schriemer* plaintiffs' Count II claims. In order to establish a genuine issue for trial on the scienter requirement, the *Schriemer* plaintiffs accordingly point primarily to the affidavit and deposition testimony of several former Diamond entity employees. The court finds this evidence insufficient to sustain the *Schriemer* plaintiffs' summary judgment burden.

Initially, the court in its discretion concludes that large portions of the affidavits submitted by Diamond entity employees Gary Mitchell and Leslie Lupovich carry no probative value whatsoever. This is because these portions fail to pass muster under Rule 56(e) of the Federal Rules of Civil Procedure, which provides in pertinent part that

> opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

This court is on record as favoring "firm" application of Rule 56(e). *Newhouse v. Probert*, 608 F.Supp. 978, 983 (W.D.Mich. 1985). The court sees no reason to relax this firmness in the present case, where the affidavit portions in question contain fraud allegations against a presumably honorable member of the bar. In such serious circumstances, it is reasonable to hold affiants to strict compliance with applicable standards.

Paragraphs 3(a), 3(i) and 3(j) of the Gary Mitchell affidavit and paragraphs 3, 4, and 9 of the Lupovich affidavit purport to show Barron's knowledge of the Diamond entities' fraud, or the affiant's knowledge of Barron's state of mind, by reference to various extrinsic documents. No sworn or certified copies of the documents referred to in these paragraphs appear in the record. Accordingly, the court will disregard the document references. *Maiorana v. MacDonald*, 596 F.2d 1072, 1080 (1st Cir.1979); *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir.1978); *Sprague v. Vogt*, 150 F.2d 795, 800 (8th Cir.1945); *State of Washington v. Maricopa County*, 143 F.2d 871, 872 (9th Cir. 1944).

Without such references, these paragraphs—like paragraphs 3(c), 3(f), and parts of 3(b), 3(d), 3(h), and 3(j) of the Gary Mitchell affidavit, and paragraphs 5, 7, 10, 11, 13, and parts of 6 and 12 of the Lupo-

vich affidavit—amount to nothing more than conclusory assertions that "Barron knew this" or "Barron knew that." These paragraphs do not show *how*, short of clairvoyance, the affiants know what Barron knew. There is no showing in these paragraphs, for instance, that the affiant was present at a particular transaction, or that he observed some objective act, that could raise an inference concerning Barron's state of mind.

Consequently, these paragraphs fail to satisfy Rule 56(e)'s personal knowledge requirement, and do not aid the *Schriemer* plaintiffs' opposition to Barron's summary judgment motion. *See Ward v. Washtenaw County Sheriff's Department*, 881 F.2d 325, 330 n. 5 (6th Cir.1989) (affidavit based on opinion and not on first-hand knowledge or observation insufficient to establish genuine issue precluding summary judgment); *Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309, 316 (6th Cir.1989) (same); *Emmons v. McLaughlin*, 874 F.2d 351, 354–55 (6th Cir.1989) (summary judgment appropriate where "vague and conclusory" affidavits failed to support nonmoving party's claims with specific facts); *Gill v. Federal Kemper Life Assurance Co.*, No. 85–3670 (6th Cir. August 1, 1986) (disposition only noted at 802 F.2d 457, full text available on WESTLAW, 1986 WL 17518, available on LEXIS, Genfed library, 6Cir file) (conclusory affidavit asserting decedent's lack of scienter "critically flawed" under Rule 56(e) where affiant in no position to possess personal knowledge of decedent's state of mind); *Maiorana*, 596 F.2d at 1079–80 and n. 11 (counteraffidavits did not comply with Rule 56(e) where affiants did not witness relevant events and affiants purported to examine defendants' thoughts as well as actions); *Cermetek*, 573 F.2d at 1376–77 (affidavit statements amounting to "opinion" and "bare assertion" not competent evidence under Rule 56(e)); *Sprague*, 150 F.2d at 800 ("[w]hen affidavits are offered ... they ... must not only be made on the personal knowledge of the affiant, but must show that the affiant possesses the knowledge asserted"); *Newhouse*, 608 F.Supp. at 983 (intentionally incomplete af-

fidavit lacking in first-hand knowledge insufficient under Rule 56(e)). *See generally* 28 Fed.Pro.L.Ed. *Pleadings and Motions* §§ 62:593, 62:595–96, 62:599 (1984 & Supp. 1989) (collecting cases).

Shorn of the foregoing nonprobative paragraphs, the Gary Mitchell and Lupovich affidavits say little to support the *Schriemer* plaintiffs' Rule 10b–5 aiding and abetting claims. Rather, they show only that Barron acted as Barton Greenberg's personal attorney in several business transactions, and that he represented the Diamond entities's interests in unidentified litigation and before the Michigan Attorney General's Consumer Protection Division. During the latter representation, which concerned only Diamond Mortgage Corporation's mortgage lending practices, Barron undoubtedly became aware that Diamond was experiencing ongoing problems with undisbursed mortgages, or promised loans that were never delivered to borrowers. This is because the problem was specifically addressed as part of Diamond's 1983 Consent Order with the Consumer Protection Division, *see Stone,* 728 F.Supp. at 1345, and as part of subsequent compliance efforts. Barron negotiated the Consent Order and supervised the Diamond entities' compliance. Also according to Gary Mitchell and Lupovich, Barron told Diamond employees on one occasion in May 1986 that he did not want to be informed of nondisbursed mortgage problems.

These facts do not support an inference that Barron had anything to do with the primary Rule 10b–5 violations at issue here. The facts obviously do not address Barron's alleged knowledge of the Diamond entities' false and misleading statements and omissions about their solvency. Nor do the *Schriemer* plaintiffs attempt to explain how these facts relate to the Diamond entities' various technical violations alleged in their "Fourth Amended Complaint." The *Schriemer* plaintiffs appear to contend, however, that these facts demonstrate that a jury question exists regarding whether Barron knew or recklessly failed to know that undisbursed mortgages were being assigned to Diamond note purchasers and CMI, contradicting the Dia-

mond entities' representations that Diamond notes and CMI holdings were secured only by valid mortgages. The court finds this contention unpersuasive.

The nondefective portions of the Gary Mitchell and Lupovich affidavits establish that Barron knew about widespread undisbursed mortgages, but they say nothing about *assignment* of those mortgages. For all the affidavits show, an undisbursed mortgage was strictly a matter between the mortgagor/borrower, the mortgage lender, and the mortgage broker, Diamond Mortgage Corporation, with no securities broker/dealer or investor in sight. Moreover, the record shows that the Diamond entities hired specialized securities counsel in late 1981, and that Barron confined his legal work after that date solely to Diamond's mortgage lending business. Accordingly, Barron occupies a position roughly analogous to Frederick Hoffecker's in these cases. Like Hoffecker, Barron appears to have concentrated exclusively on the mortgage lending side of the equation, with little reason to inquire about investors and representations made in the sale of Diamond notes and CMI shares.

The *Schriemer* plaintiffs attempt to bolster this part of their argument by pointing to the deposition testimony of two additional Diamond employees, Patti Mitchell and Paul Wellington. This evidence likewise fails to demonstrate Barron's scienter concerning fraudulent assignment of undisbursed mortgages. Patti Mitchell testified to several conversations she had with Barron about undisbursed mortgages, but these centered solely upon relations between lender and borrower, and between Diamond and the Consumer Protection Division. When asked "[w]as there ever any concern expressed that the investors were not secure as they were led to believe in their prospectus?," Patti Mitchell answered "[n]o."

Paul Wellington's testimony is, for the most part, vague and generalized. Wellington's testimony suggests that at some time he allegedly discovered 450–500 undisbursed mortgages assigned to Obie investors. He does not state that he ever dis-

cussed these assignments specifically with Barron. Rather, he points to one incident occurring in late 1985 when he brought the assignment of an undisbursed mortgage to Barton Greenberg's attention at Greenberg's Diamond office. Barron was present in the office at the time, helping Greenberg negotiate an unrelated transaction. Greenberg considered the assignment "a serious problem," and instructed Wellington about how to resolve it. Wellington later confronted Greenberg with his fears about the widespread nature of such problems, and Greenberg allegedly assaulted him. Following the assault, Wellington informed Barron of the surrounding circumstances, including his discussion with Greenberg regarding assignment of undisbursed mortgages. Barron contacted Greenberg, and later assured Wellington that "no longer would any of this happen."

Wellington's testimony, added to the record as a whole, raises a legitimate question whether Barron should have known about significant assignment of undisbursed mortgages to Obie investors. As the court has previously discussed, however, "should have known" does not satisfy the scienter requirement of a Rule 10b–5 aiding and abetting claim. The record shows only that Barron had knowledge of one questionable assignment, and knew of Wellington's allegations about more widespread assignment problems. The specific incident was taken care of without apparent difficulty. As for Wellington's confrontation with Greenberg, it appears that Barron did not investigate the substance of Wellington's and Greenberg's discussion beyond a brief talk with Greenberg himself.

While the jury might conclude in these circumstances that Barron was negligent in failing to discover and disclose the fraudulent assignment of undisbursed mortgages, the evidence does not support an inference of recklessness or actual knowledge. The record establishes that Barron's primary concern was mortgage lending; assignment matters were part of the investment side of the Diamond entities' business. Consequently, the jury could not find that Barron's failure to press Greenberg about Wellington's concerns, which were outside the scope of Barron's legal representation of the Diamond entities, was highly unreasonable conduct amounting to a gross departure from the standards of due care.

Barron's alleged May 1986 statement to Diamond employees that he did not want to know about undisbursed mortgage problems may or may not appear somewhat unusual. The court concludes, however, that this statement does not support an inference of scienter in the absence of any description in the Gary Mitchell and Lupovich affidavits of the context in which the statement was made. Accordingly, nothing in the record suggests that Barron participated in any "transactions of an extraordinary nature." *Washington County Utility District*, 676 F.2d at 226. Similarly, the record fails to show that Barron benefitted in any way from securities fraud. The *Schriemer* plaintiffs point to the obvious fact that the Diamond entities paid legal fees to Barron. Again, however, these fees were paid for work done by Barron on the mortgage lending side of the ledger. Barron did not "receive fees for rendering advice in connection with the [securities] sales to the plaintiffs." *Barker*, 797 F.2d at 497.

The foregoing analysis satisfies the court that summary judgment should issue for the Barron defendants on Count II of the *Schriemer* plaintiffs' "Fourth Amended Complaint." The Barron defendants have asked the court to impose sanctions under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 upon the *Schriemer* plaintiffs and the lawyer who signed their first complaint in January 1987. The basis of this request is the plaintiffs' and lawyer's asserted failure to make a reasonable factual inquiry regarding the Barron defendants' role in these cases. The Barron defendants' request fails, however, to address the "[r]elevant factors for determining whether the [Rule 11] reasonable inquiry test has been met." *Davis v. Crush*, 862 F.2d 84, 88 (6th Cir. 1988) (listing factors). The request similarly fails to detail the asserted vexatious *conduct*, as opposed to vexatious pleading,

under section 1927. *See Bodenhamer Building Corp. v. Architectural Research Corp.,* 873 F.2d 109, 114 (6th Cir.1989). The sanctions request will be denied.

### D. Conclusion

The accompanying order will summarize the court's specific rulings. The court has now dismissed all parties and claims in these actions except Greenberg and the claims upon which he has defaulted. The court will hold a default judgment hearing concerning Greenberg on June 15, 1990 in accordance with Rule 55(b)(2) of the Federal Rules of Civil Procedure. Final judgment will issue following that hearing.

### ORDER ON PENDING MOTIONS

In accordance with the opinion filed this date,

IT IS ORDERED that the summary judgment motion filed by defendants Ronald M. Barron and Ronald M. Barron & Associates, P.C., is granted, and they are dismissed from the *Schriemer* consolidated action with prejudice.

IT IS FURTHER ORDERED that the request for sanctions under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 filed by defendants Ronald M. Barron and Ronald M. Barron & Associates, P.C., is denied.

IT IS FURTHER ORDERED that the summary judgment motion filed by defendant Frederick Hoffecker is granted, and he is dismissed from the *Mercer* consolidated action with prejudice.

IT IS FURTHER ORDERED that the summary judgment motion filed by defendant James Karpen is granted, and he is dismissed from the *Mercer* consolidated action with prejudice.